**THOMAS & BETTS CORPORATION and Thomas & Betts Holdings, Inc., Plaintiffs–Appellants,**

v.

**PANDUIT CORPORATION, Defendant–Appellee.**

**Nos. 96–3914, 97–2108.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 24, 1997.

Decided March 4, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied April 30, 1998.

Malcolm H. Brooks, Marc L. Fogelberg, McBride, Baker & Coles, Chicago, IL, Roy H. Wepner, Keith E. Gilman, Sidney David (argued), Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, James Hay, Lewis & McKenna, Saddle River, NJ, for Plaintiffs–Appellants.

John T. Brown (argued),David C. Hilliard, John M. Murphy, Mark F. Schultz, Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Chicago, IL, Charles R. Wentzel, Mark D. Hilliard, Robert A. McCann, Panduit Corp., Tinley Park, IL, for Defendant–Appellee.

Before CUMMINGS, BAUER, and ROVNER, Circuit Judges.

BAUER, Circuit Judge.

In this case, plaintiffs Thomas & Betts Corporation and Thomas & Betts Holdings, Inc. appeal from the district court's grant of summary judgment to the defendant. The plaintiffs advance two primary theories with respect to Count I of their complaint, which alleged unfair competition on the part of defendant Panduit Corporation: 1) the district court erred in finding that a product configuration disclosed in a utility patent is not entitled to trademark protection; and 2) questions of fact exist which preclude the district court's grant of summary judgment. With respect to Count II of the complaint, which sought cancellation of one of the defendant's trademarks, the plaintiffs allege that the district court erroneously found that no questions of fact exist. Because we find that Thomas & Betts' contentions are meritorious,

we reverse the judgment of the district court and remand this case for trial.

## BACKGROUND

This case is presently on its third sojourn to the court of appeals. On its first sally, we denied the defendant's motion to stay a preliminary injunction pending an appeal on the merits. *Thomas and Betts Corp. v. Panduit Corp.*, 34 U.S.P.Q.2d 1607 (7th Cir.1994). During the next visit, we reached the merits of the defendant's appeal from the grant of a preliminary injunction to the plaintiffs, reversing the district court's decision because we found that the plaintiffs had not demonstrated a reasonable likelihood of success on the merits. *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 664 (7th Cir.1995), *cert. denied*, 516 U.S. 1159, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996) (hereinafter *"T & B I"*). In our present rendezvous, the plaintiffs appeal from the district court's grant of summary judgment to the defendant on all counts of their complaint. While we assume familiarity with our previous opinions, we will borrow from them in the following brief summary of pertinent facts.

The parties in this case are the nation's largest suppliers of cable ties, which, as their name implies, are small nylon belts used to bundle wires. Cable ties consist of a strap terminating at one end in a tapered tail and at the other in a head which incorporates a horizontal slit and locking mechanism. The strap is looped around the group of wires to be secured and the tail is inserted through the slit in the head and pulled tight, triggering the locking mechanism and prohibiting reverse movement of the tail. The result is a tight bundle of wires with only the thickness of the head (which is made as small as possible to avoid snagging) protruding above the strap and bundled wires.

Cable ties feature either a one-piece or a two-piece locking mechanism. While we need not wade too heavily into the technical aspects of these mechanisms (a detailed explanation is provided in *T & B I*, 65 F.3d at 656), a brief description will further the understanding of this case. In a onepiece system, a nylon pawl is molded into the head of the cable tie, protruding into the slit in the head through which the strap of the tie passes. The pawl acts as a one-way ratchet, catching on ridges molded into the strap and preventing the strap from slipping out of the slit once the strap is tightened around the bundle of wires. At issue in this case is the two-piece tie, in which the nylon pawl is replaced by a metal barb inserted into the head of the tie. The metal barb sits in a slot transverse to the slit for the strap, and when the strap is pulled taut through the slit, the tension on the strap causes the barb to flex, bite into the nylon strap, and hold tight.

Plaintiff Thomas & Betts Corporation ("T & B") obtained a patent on the two-piece cable tie in 1965 (referred to throughout this opinion as the "Schwester patent"), which remained in effect until its expiration in 1982. The Schwester patent disclosed a two-piece cable tie with an oval head, metal barb, and transverse slot. While the slot, barb, and head portions of the cable tie were part of the claims of the Schwester patent, the oval shape was not; it was illustrated in a drawing of the cable tie and mentioned in the patent's specifications. At present, T & B markets a two-piece cable tie under the trademark "TY–RAP" which is essentially identical to that disclosed in the Schwester patent. In about 1994, defendant Panduit Corporation ("Panduit") began to produce a cable tie similar to that of T & B, sold under the trademark "BARB–TY." Panduit's product is substantially similar in appearance to that produced by T & B.

In response, T & B filed suit in the Northern District of Illinois on April 29, 1994, seeking a permanent injunction against Panduit's manufacture of the BARB–TY product and asserting the following claims: 1) trade dress infringement pursuant to 15 U.S.C. § 1125(a); 2) unfair competition under 15 U.S.C. § 1125(a) and withdrawal of Panduit's "BARB–TY" trademark registration under 15 U.S.C. § 1064(3); 3) common law unfair competition; 4) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and the Uniform Deceptive Trade Practices Act; and 5) violation of the Illinois Anti–Dilution Act. T & B also sought a preliminary injunction against Panduit. The parties consented to proceed before a magis-

trate, and Magistrate Judge Ronald Guzman held an evidentiary hearing on T & B's motion for a preliminary injunction on July 19, 20, and 21, 1994. On December 19, 1994, Judge Guzman found in favor of T & B and entered a preliminary injunction against Panduit's copying of T & B's cable tie. *Thomas and Betts Corp. v. Panduit Corp.*, 1994 WL 714619 (N.D.Ill.1994). Panduit appealed, and this court reversed. *T & B I*, 65 F.3d 654.

The case was subsequently transferred to Magistrate Judge Morton Denlow, and Panduit filed a motion for summary judgment on March 26, 1996. T & B filed its response on April 23, 1996, and oral argument was held on July 11. On August 15, 1996, Judge Denlow granted Panduit's motion with respect to Counts I, III, IV, and V of T & B's complaint. *Thomas & Betts Corp. v. Panduit Corp.*, 935 F.Supp. 1399 (N.D.Ill.1996). After further briefing, the district court granted Panduit's motion with respect to Count II on October 17, 1996. *Thomas & Betts Corp. v. Panduit Corp.*, 940 F.Supp. 1337 (N.D.Ill.1996). Final judgment was entered in favor of Panduit on the same day. On November 14, 1996, T & B filed a timely notice of appeal, and the case is now properly before this court.

## DISCUSSION

As a preliminary matter, we note that while the district court granted summary judgment to Panduit on all five counts of T & B's complaint, T & B is only appealing the district court's judgment on Counts I and II, the federal law claims brought by T & B. Since there is no challenge to the district court's grant of summary judgment on Counts III, IV, and V, we merely acknowledge the existence of these state-law claims for the sake of completeness and then bid them adieu for the remainder of this opinion.

### I. Entitlement of Cable Tie Head to Trademark Protection

The first, and foremost, issue presented in this appeal is a matter of law and a matter of first impression in the Seventh Circuit. Succinctly stated, the question is this: can a product configuration that is disclosed in an expired utility patent be protected as a trade dress under the Lanham Act?[1] The district court answered this question in the negative, holding that "the subject of an expired utility patent which is disclosed as the 'best mode' in the patent cannot be the subject of trademark protection with respect to the invention disclosed to the public." 935 F.Supp. at 1409. Since this is a conclusion of law, we examine the district court's holding *de novo*. *In the Matter of 203 N. LaSalle Street Partnership*, 126 F.3d 955, 961 (7th Cir.1997). We believe that the district court's sweeping holding misstates the law regarding the availability of trademark (or trade dress) protection for previously patented articles, and we reverse in this respect.

■ At the heart of this dispute is the relationship between patent law and trademark law; thus, an appropriate place to begin is with a summary of the purposes of and policies behind each. The roots of patent law extend to the beginning of our country, with the Constitution providing that "The Congress shall have the power ... [t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const., art. I, § 8, cl. 8. To carry out this objective, American patent law offers "a right of exclusion for a limited period as an incentive to inventors to risk the often enormous costs in terms of time, research, and development." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480, 94 S.Ct. 1879, 1885, 40 L.Ed.2d 315 (1974). Not all inventions are patentable; such protection is limited to any "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof...." 35 U.S.C. § 101. Furthermore, to be patented, any such item must fulfill three conditions: it must be novel, it must possess utility, and it must be nonobvious. 35 U.S.C. §§ 101, 102, 103; *see*

---

1. In this opinion, we will use the terms "trade dress" and "trademark" interchangeably, since the applicable law, the Lanham Trademark Act, "provides no basis for distinguishing between trademark and trade dress." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773, 112 S.Ct. 2753, 2760, 120 L.Ed.2d 615 (1992).

*generally Kewanee,* 416 U.S. at 476–78, 94 S.Ct. at 1883–85. Those inventions meeting these statutory tests are granted patent protection, which gives the inventor a termed monopoly on the manufacture or exploitation of the device.[2]

In return for this monopoly on producing the patented article, the patentee must make an "adequate and full" disclosure of his invention so that, at the expiration of his monopoly, "the knowledge of the invention enures to the people, who are thus enabled without restriction to practice it and profit by its use." *Kewanee,* 416 U.S. at 480–81, 94 S.Ct. at 1886 (quoting *United States v. Dubilier Condenser Corp.,* 289 U.S. 178, 187, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933)). In sum, our system of patent protection serves the following objectives:

> First, patent law seeks to foster and reward invention; second, it promotes disclosure of inventions to stimulate further innovation and to permit the public to practice the invention once the patent expires; third, the stringent requirements for patent protection seek to assure that ideas in the public domain remain there for the free use of the public.

*Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 262, 99 S.Ct. 1096, 1099, 59 L.Ed.2d 296 (1979) (citing *Kewanee,* 416 U.S. at 480–81, 94 S.Ct. at 1885–86).

Trademarks, by contrast, are not mentioned in the Constitution but are protected by the Lanham Trademark Act, 15 U.S.C. § 1051 *et seq.* Thereunder, a suitably aggrieved person has a federal cause of action against anyone who "on or in connection with any goods ... uses in commerce any word, term, name, symbol, or device, or any combination thereof" in a manner which is likely to cause confusion as to the origin of the product. *See* 15 U.S.C. § 1125(a). The policies behind trademark protection have been outlined as follows:

The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.... National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation.

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985) (internal citations omitted).

In order to be registrable as a trademark, a mark must be capable of distinguishing the applicant's goods from those of others. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). Marks are classified according to their distinctiveness, and have been broken into the following categories: 1) generic; 2) descriptive; 3) suggestive; 4) arbitrary; and 5) fanciful. *Id.* (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976)). Marks classified as generic are not registrable as trademarks; in contrast, those which are suggestive, arbitrary, or fanciful are deemed inherently distinctive and are entitled to such protection. *Two Pesos,* 505 U.S. at 768, 112 S.Ct. at 2757. A descriptive mark, while not inherently distinctive, can be registered as a trademark if it acquires secondary meaning (that is, if it "has become distinctive of the applicant's goods in commerce"). *Id.* at 769, 112 S.Ct. at 2757 (quoting 15 U.S.C. § 1052(e) and (f)). In addition, protection under the Lanham Act is only afforded to nonfunctional marks. Thus, in summary, an identifying mark is distinctive and can be protected as a trademark if it is nonfunctional and if it either 1) is inherently distinctive or 2) has acquired distinctiveness through secondary meaning. *Two Pesos,*

---

**2.** At the times relevant to this case, patent law provided that:

> Every patent shall contain a ... grant to the patentee, his heirs or assigns, for the term of seventeen years, ... of the right to exclude others from making, using, or selling the invention throughout the United States....

35 U.S.C. § 154 (1984). This section was amended by Congress in 1988 to provide a twenty year term of exclusion. *See* 35 U.S.C. § 154 (West Supp.1997).

505 U.S. at 769, 112 S.Ct. at 2757–58. With these policies in mind, we turn to the relationship between patent law and trademark law.

In its opinion, the district court found that allowing T & B trade dress protection for the head shape of its cable tie was "unsound public policy, contravenes the Patent Act and would defeat the expectations of the public and the parties." 935 F.Supp. at 1408. It noted that T & B understood, at the time it received its patent, that competitors would be able to copy the invention after seventeen years, and furthermore that the public expected to receive the benefits of patent disclosure (in this case, a competitive cable-tie market) after the seventeen years had passed. Accordingly, it found that anything less than a strict rule that the best mode disclosed in a patent could be copied would defeat everyone's expectations. "If a prospective competitor must face the threat of Lanham Act litigation for 'slavishly copying' the invention, this would seriously undermine the Patent Act." *Id.* An underlying belief of the district court, then, is that the Patent Act and the Lanham Act are, at least to some extent, in conflict.

 When confronted with apparently conflicting statutes which are "capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1018, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815 (1984) (quoting *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 133–34, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974) (other citations omitted)). Unlike state laws prohibiting unfair competition, federal trademark protection cannot be pre-empted by patent law. *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co., Inc.,* 963 F.2d 628, 638 (3d Cir.1992). However, it has been noted that there is an "undeniable tension" between trademark protection of product configurations and patent law, *id.,* the subject to which we now turn.

In its brief, T & B argues that the district court erred in holding that the expired Schwester patent destroyed T & B's Lanham Act rights to protection of the shape of its cable tie head. First, T & B asserts that the right to copy stemming from patent law (which we discuss below) does not preclude the application of the Lanham Act to its cable tie head. As its first line of defense against T & B's attack, Panduit counters that when the Schwester patent expired, the cable tie depicted therein was dedicated to the public and that Panduit now has the right to copy it without interference from the trademark laws. This argument, on its face, is appealing. Patent law seeks to foster and reward invention by providing the inventor with a monopoly of limited duration; in return for that reward, the inventor must disclose his invention and dedicate it to the public. Stemming from the inventor's dedication of the invention to the public, as the district court correctly noted, a "long line" of Supreme Court cases have held that federal patent law creates a right to copy inventions to which patent protection has been extended once the patent expires. The Supreme Court has explained this right to copy thusly:

> It is self evident that on the expiration of a patent the monopoly created by it ceases to exist, and the right to make the thing formerly covered by the patent becomes public property. It is upon this condition that the patent is granted. It follows, as a matter of course, that on the termination of the patent there passes to the public the right to make the machine in the form in which it was constructed during the patent.

*Singer Mfg. Co. v. June Mfg. Co.,* 163 U.S. 169, 185, 16 S.Ct. 1002, 1008, 41 L.Ed. 118 (1896). See also *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 165, 109 S.Ct. 971, 985, 103 L.Ed.2d 118 (1989) ("For almost 100 years it has been well established that in the case of an expired patent, the federal patent laws do create a federal right to 'copy and use.'") (emphasis in original); *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 230, 84 S.Ct. 784, 788, 11 L.Ed.2d 661 (1964) ("when the patent expires the monopoly created by it expires, too, and the right to make the article-including the right to make it in precisely the shape it carried when patented—passes to the public"); *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 119–20, 59 S.Ct. 109, 114, 83 L.Ed. 73 (1938) ("upon

expiration of the patents, the form ... was dedicated to the public."). Upon closer inspection, these cases are distinguishable from the present one, and their findings are not determinative here.

In Bonito Boats and Sears, the Supreme Court examined the relationship between federal patent law and state unfair competition law, not between federal patent law and federal trademark law. The holdings of these cases, then, has no effect on the scope of federal trademark or unfair competition law. *See Esercizio v. Roberts,* 944 F.2d 1235, 1241 (6th Cir.1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992). Furthermore, as we noted in *Kohler Co. v. Moen Inc.,* 12 F.3d 632 (7th Cir.1993), the Florida statute at issue in Bonito Boats granted "patent-like rights far exceeding any right available under the Lanham Act" and its holding is not analogous to the present situation. *Kohler,* 12 F.3d at 641.

The *Singer* case is factually distinguishable from the present situation. In *Singer,* the Supreme Court found that it could not "be denied that the Singer machines were covered by patents.... There can also be no doubt that the necessary result of the existence of these patents was to give to the Singer machines, as a whole, a distinctive character and form which caused them to be known as Singer machines, as deviating and separable from the form and character of machines made by other manufacturers." *Singer,* 163 U.S. at 179, 16 S.Ct. at 1006. Unlike the present case, the "right to make the machine in the form in which it was constructed during the patent" applied because the machines' shapes were dictated by patents covering the machines' various components. In this case, the oval-shaped head of T & B's cable tie was not driven by the cable tie's components (i.e., the locking mechanism, tail, etc.). Thus, the context in which the Supreme Court applied the right to copy an invention whose patent had expired in *Singer* is different from that arising in the present case, and a strict application of *Singer*'s principles does not support the district court's determination.

In *Kellogg,* the Supreme Court cited *Singer* in reaching the conclusion that Kellogg could utilize a pillow-shaped form in making shredded wheat biscuits despite the fact that a competitor had done so first. Analogous to the situation in *Singer,* however, patented machines were used by the competitor, and those machines "were designed to produce only the pillow-shaped biscuits." *Kellogg,* 305 U.S. at 119, 305 U.S. at 114. It seems, then, that the shape of the shredded wheat biscuit was dictated by the patented machines used to produce it, a situation not present in our case. Additionally, the competitor had taken out a design patent on the pillow-shaped form, something which T & B did not do with respect to the oval shape of its cable tie head. *Id.* The cases cited by Panduit, therefore, are distinguishable from the present case, and their discussions of the right to copy formerly patented articles are not determinative here.

Panduit's case is also seemingly strengthened by *Scott Paper Co. v. Marcalus Mfg. Co.,* 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945), where the Supreme Court stated that:

> By the force of the patent laws not only is the invention of a patent dedicated to the public upon its expiration, but the public thereby becomes entitled to share in the good will which the patentee has built up in the patented article or product through the enjoyment of his patent monopoly. Hence we have held that the patentee may not exclude the public from participating in that good will or secure, to any extent, a continuation of his monopoly by resorting to the trademark law and registering as a trademark any particular descriptive matter appearing in the specifications, drawings or claims of the expired patent, whether or not such matter describes essential elements of the invention or claims.

326 U.S. at 256, 66 S.Ct. at 104–05 (citing *Kellogg,* 305 U.S. at 117–20, 59 S.Ct. at 113–14 and *Singer,* 163 U.S. at 185, 16 S.Ct. at 1008).

In *Scott Paper,* however, the question presented was whether the assignor of a patent was estopped, by virtue of his assignment, from defending a suit for infringement of the assigned patent on the ground that the allegedly infringing device was that of a prior art

expired patent.[3] *Id.* at 250, 66 S.Ct. at 102. In determining that assignor estoppel did not apply, the Court noted that the assigned patent covered a machine which was identical to a previously patented machine on which the patent had expired. *Id.* at 254, 66 S.Ct. at 103–04. The Court held that assignor estoppel could not apply in *Scott Paper*, since the patent laws do not contemplate "that anyone by contract or any form of private arrangement may withhold from the public the use of an invention for which the public has paid by its grant of a monopoly and which has been appropriated to the use of all." *Id.* at 256–57, 66 S.Ct. at 105. The case thus turned on the issue of assignor estoppel, and the Court's discussion of trademark law is merely dicta. See *T & B I*, 65 F.3d at 659 (same conclusion). The cases cited by Panduit in defense of the district court's decision are thus distinguishable from the present case.

Furthermore, the right to copy established in the cases cited by Panduit is far from absolute. In *Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), the Supreme Court stated:

> Here Day–Brite's fixture has been held not to be entitled to a design or mechanical patent. Under the federal patent laws it is, therefore, in the public domain and can be copied in every detail by whoever pleases. It is true that the trial court found that the configuration of Day–Brite's fixture identified Day–Brite to the trade because the arrangement of the ribbing had, like a trademark, acquired a "secondary meaning" by which that particular design was associated with Day–Brite. But if the design is not entitled to a design patent *or other federal statutory protection*, then it can be copied at will.

376 U.S. at 237–38, 84 S.Ct. at 782 (emphasis added). This court has previously found that

the Lanham Act "falls under the rubric of 'other federal statutory protection'" and that *Compco* (and its companion case, *Sears*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661) does not preclude federal trademark protection of designs. *Kohler*, 12 F.3d at 640 (citing *Esercizio*, 944 F.2d at 1241 (other citations omitted)).

Moreover, since setting forth the right to copy inventions unprotected by patent law, the Supreme Court has recognized that trademark law and patent law are not inherently in conflict. In *Bonito Boats*, the Court noted:

> Indeed, there are affirmative indications from Congress that both the law of unfair competition and trade secret protection are consistent with the balance struck by the patent laws. Section 43(a) of the Lanham Act, ... 15 U.S.C. § 1125(a), creates a federal remedy for making "a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same...." Congress has thus given federal recognition to many of the concerns that underlie the state tort of unfair competition, and the application of *Sears* and *Compco* to nonfunctional aspects of a product which have been shown to identify source must take account of competing federal policies in this regard.

*Bonito Boats*, 489 U.S. at 166, 109 S.Ct. at 985; *see also Application of Penthouse Intern. Ltd.*, 565 F.2d 679, 683 n. 3 (C.C.P.A. 1977) ("As this court has often said, copyright, patent and trademark laws stem from different concepts and offer different kinds of protection, which are not mutually exclusive.") Thus, in *Kohler*, we remarked that "courts have consistently held that a product's different qualities can be protected simultaneously, or successively, by more than one statutory means for protection of intel-

---

**3.** Marcalus was attempting to defend against the charge of infringement by alleging that the patent it had assigned was invalid. The argument of "assignor estoppel" presented by Scott Paper is "that an assignor of a patent right is estopped to attack the utility, novelty or validity of a patented invention which he has assigned or granted as against any one claiming the right under his assignment or grant. As to the rest of the world, the patent may have no efficacy and create no right of monopoly; but the assignor can not be heard to question the right of his assignee to exclude him from its use." *Scott Paper*, 326 U.S. at 252, 66 S.Ct. at 102 (quoting *Westinghouse Electric & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 349, 45 S.Ct. 117, 119, 69 L.Ed. 316 (1924)).

lectual property." *Kohler,* 12 F.3d at 638 (citations omitted).

■ The correct rule of law to be applied in this case is no different from that which applies in any other trademark infringement context and is exemplified in *Best Lock Corp. v. Schlage Lock Co.,* 56 C.C.P.A. 1472, 413 F.2d 1195 (C.C.P.A.1969). In *Best Lock,* the Court of Customs and Patent Appeals held that a feature of a product disclosed in an expired patent which serves a functional purpose is not entitled to trademark protection. *Id.* at 1199. By stating what types of features disclosed in a patent application *cannot* be accorded trademark protection, the court implicitly accepted that some disclosed features were not automatically disqualified from trademark protection by virtue of their disclosure. *Accord Application of Shenango Ceramics Inc.,* 53 C.C.P.A. 1268, 362 F.2d 287 (C.C.P.A.1966) (denying trademark protection because alleged distinguishing feature, which was disclosed in expired patent, was functional). The Tenth Circuit, in *Vornado Air Circulation Systems, Inc. v. Duracraft Corp.,* 58 F.3d 1498 (10th Cir.1995), *cert. denied,* 516 U.S. 1067, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996) (discussed *infra*), did not foreclose this possibility. In Vornado, the court rejected trademark protection for the feature at issue because it was claimed in the patent and without it "the invention could not fairly be said to be the same invention." *Vornado,* 58 F.3d at 1510. Hence, the court did not refuse trademark protection because there is a blanket prohibition against a feature of an invention disclosed in a patent becoming a trademark. *Id.* Indeed, we have not found, nor has the appellee cited, any case which holds that any feature of a product somehow disclosed in a patent application cannot receive trademark protection (save, of course, the district court's opinion below). Therefore, we find that there is no *per se* prohibition against features disclosed in a patent receiving trademark protection after the patent has expired. *See* 1 J. Thomas McCarthy, McCarthy on Trademarks § 6.12 (4th ed. 1996) ("[T]here is no direct causal relationship between expiration of a patent on a product and the legal protectability of a trademark on that product.").

■ The safeguard against an impermissible extension of a patent monopoly by a trademark, as noted above, is the functionality doctrine: a configuration of an article cannot receive trademark registration if its purpose is to contribute functional advantages to the article or if the configuration results from functional considerations. *Best Lock,* 413 F.2d at 1199; *see also W.T. Rogers Co., Inc. v. Keene,* 778 F.2d 334, 337 (7th Cir.1985) ("And provided that a defense of functionality is recognized, there is no conflict with federal patent law...."). The reasoning behind the exclusion of functional features from trademark protection is this:

[S]ome articles, made in a purely arbitrary configuration (e.g., the wine bottle considered in [*Application of]* Mogen David [Wine Corp.,* 51 C.C.P.A. 1260, 328 F.2d 925 (C.C.P.A.1964)] may *perform* a function, holding wine, which could equally well be served by containers of many other shapes, and in such circumstances the *incidental* function should not by itself preclude trademark registrability if the other conditions precedent are present. That is a quite different situation from a configuration whose purpose is to provide a functional advantage. Where such a functional purpose exists, the rule is ... that the configuration is not registrable as a trademark. The reason is clear. If a configuration is functional in that sense, then everyone has the right to use the configuration for its functional purpose, subject only to such exclusive right for a *limited* time as *may* exist under the patent laws.

*Best Lock,* 413 F.2d at 1199; *see also Application of Deister Concentrator Co., Inc.,* 48 C.C.P.A. 952, 289 F.2d 496, 502 (C.C.P.A. 1961) ("A feature dictated solely by 'functional' (utilitarian) considerations may not be protected as a trademark; but mere possession of a function (utility) is not sufficient reason to deny protection."). The concept that the functionality of a feature precludes its registration as a trademark is well established, and there is no reason that it should not apply to features disclosed in expired patents. *See, e.g., Kellogg,* 305 U.S. at 122, 59 S.Ct. at 115 ("Moreover, the pillow-shape must be used for another reason. The evi-

dence is persuasive that this form is functional. . . ."). However, as noted in *Best Lock*, the fact that a feature sought to be trademarked was contained in an expired patent is "some evidence" of functionality, and thus the existence of the expired patent must be taken into consideration in determining functionality. *Best Lock*, 413 F.2d at 1199 (citing *Shenango*, 362 F.2d at 291–92); *see also In re Deister*, 289 F.2d at 501 ("We . . . see no reason to consider appellant's patents except to the extent they may contain evidence of the functionality of the . . . shape sought to be registered. . . .").

Both of the parties have cited (as did the district court) only one case which is almost directly on point with the issue currently before us. In *Vornado Air Circulation Systems, Inc. v. Duracraft Corp.*, 58 F.3d 1498 (10th Cir.1995), *cert. denied*, 516 U.S. 1067, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996), the Tenth Circuit held that where a disputed product configuration is part of a claim in a utility patent and is a described, significant inventive aspect of that invention, patent law prohibits the configuration from being protected as a trade dress even if it is nonfunctional. *Vornado*, 58 F.3d at 1510. The court defined a "significant inventive aspect" of an invention as one without which "the invention could not fairly be said to be the same invention." *Id.* The Tenth Circuit cautioned that in future cases, the contribution of a particular configuration to the inventiveness of the patented product may not be clear, and it might be necessary for the district court to conduct a factual inquiry to supplement the court's reading of the patent's claims and descriptions. *Id.* However, because the facts before the court in *Vornado* clearly showed that the product configuration in question was a significant inventive aspect of the patented invention, no hearing was necessary and the Tenth Circuit found that the product configuration in question was not entitled to trademark protection. *Id.*

 This case is distinguishable from *Vornado*, however, in one basic respect: the shape of the head of T & B's cable tie is not part of the claims in the Schwester patent, and the strict holding of *Vornado*, were we to adopt it, would not be dispositive of the question before us.[4] Our finding is contrary to that of the district court, which stated that "it is the determination of this Court that the oval shaped clinching eyelet is part of the claimed patent. . . ." 935 F.Supp. at 1410. T & B has challenged this finding, see Appellants' Brief at 16–17, and we determine that it is erroneous. The construction and interpretation of a patent claim is a matter of law exclusively within the province of the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 371–73, 116 S.Ct. 1384, 1387, 134 L.Ed.2d 577 (1996). Accordingly, we review the findings of Magistrate Judge Denlow with regard to the claims contained in the Schwester patent *de novo*. *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1572 (Fed.Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1548, —— L.Ed.2d —— (1998). In doing so, we find that the district court's determination that the oval-shaped head was claimed in the Schwester patent is erroneous.

The claims as set forth in the Schwester patent, on which the district court based its determination, are as follows:

What is claimed is:

1. A self clinching bundling strap comprising a head-end portion, a tapered tail-end portion and a body portion therebetween, said head-end portion having a transverse aperture therethrough and including an eyelet portion projecting from one side thereof with a gusset therebetween on the strap side of said eyelet, said eyelet portion having a rectangular slot in the end face thereof in alignment with and extending into said gusset forming a rectangular recess therewith within said eyelet portion in communication with said aperture, and a resilient metallic tongue having one end portion thereof imbedded in said gusset with its opposite end portion extending through said recess into said aper-

4. Although we noted this fact in *T & B I*, 65 F.3d at 659–60, we went on to discuss whether the differences between the present case and *Vornado* dictated a different result. Our discussion of this issue was purely dicta, however, since the outcome of the case was resolved on another basis, and does not constitute the law of the case or any other binding precedent for our current consideration.

ture and across the axial center thereof at an acute angle thereto presenting a line edge transversely of the axial center of said aperture adapted for locking the body portion of said strap in minute increments of adjustment against relative reverse movement when looped upon itself through said aperture.

2. A self clinching bundling strap comprising a head-end portion, a tapered tail-end portion and a body portion therebetween, said head-end portion having a transverse aperture therethrough and including an eyelet portion projecting from one side thereof with a gusset therebetween on the strap side of said eyelet portion, said eyelet portion having a pair of rectangular slots in the free end face thereof in alignment with said gusset, one of said slots extending into said gusset and forming therewith a rectangular recess within said eyelet portion in communication with said aperture, and a resilient metallic tongue having one end portion thereof embedded in said gusset with its opposite end portion extending through said recess into said eyelet portion and across the axial center thereof at an acute angle thereto and presenting a line edge transversely of the axial center thereof adapted for locking the body portion of said strap in minute increments of adjustment against relative reverse movement when looped upon itself through said aperture, said other rectangular slot providing clearance for the angular insertion of said metallic tongue into said gusset.

3. A self clinching bundling strap comprising a head-end portion, a tapered tail-end portion and a body portion therebetween, said head-end portion having a transverse aperture therethrough including an eyelet portion projecting axially from one side thereof with a gusset therebetween on the strap side of said eyelet portion, said eyelet portion having a rectangular slot in the end face thereof in alignment with said gusset, said slot extending into said gusset and forming therewith a rectangular recess within said eyelet portion in communication with the

aperture through the head-end portion of said strap, and a flat resilient metallic tongue having a substantially symmetrical pointed end portion thereof imbedded in said gusset with its opposite end portion extending through said recess into said aperture at least to the axial center thereof at an acute angle thereto and presenting a bevelled (sic) end face defining a knife edge transversely of the axial center of said aperture adapted for engaging and locking the body portion of said strap in minute increments of adjustment against relative reverse movement when looped upon itself through said aperture.

Schwester Patent, Appendix to Parties' Briefs at 501 (hereafter "App."). Despite the advanced level of legalese with which these claims are drafted, they resemble English closely enough for us to clearly discern that the oval-shaped head of T & B's cable tie is not part of the claimed invention. The claims do mention a "head-end portion," but no shape is contemplated therein. We therefore find that, as a matter of law, the oval shape of T & B's cable tie is not part of the invention claimed in the Schwester patent, and that the district court erred in determining that it was. In sum, the preceding long journey has brought us to the conclusion that the strict holding of *Vornado* is not applicable in the instant case, and it does not foreclose our reasoning above.

T & B also argues that the district court erred in finding that the oval-shaped head was part of the "best mode" set forth (as required) in the Schwester patent, and also erred as a matter of law when it determined that the "best mode" contained in an expired patent could be copied without interference from the Lanham Act. Since our previous discussion addresses these concerns, we need not reach their merits here.

 In summary, we find that the district court's legal conclusion that the disclosure of a feature in an expired patent (whether as the "best mode" or otherwise[5]) automatically precludes trademark protection is erroneous. Instead, because the oval

---

5. Since we do not separately reach the merits of this argument, we need not decide whether T & B's assertion that the oval-shaped head was not part of the "best mode" is correct.

shape of the head is not part of the claims of the patent, the appropriate test to apply in determining whether Panduit's cable ties infringe on T & B's rights in the oval shape is that which applies in any other trade dress (or trademark) infringement case. As such, we reverse the district court's legal conclusions. Our holding does not render the entire judgment of the district court erroneous, however. Recognizing that this was a matter of first impression in the Seventh Circuit, the district court applied the traditional test to T & B's claims, finding that even thereunder T & B's trade dress infringement claim must fail. T & B challenges this finding as well, the subject to which we now turn.

## II. Merits of Trade Dress Infringement Claim

As previously noted, the court found that Panduit was entitled to summary judgment on all of the counts in T & B's complaint. T & B argues that the district court erred in finding that there were no genuine issues of material fact on any of the elements of its trade dress infringement claim and asserts that we should reverse. We review the district court's grant of summary judgment *de novo*. *McGinn v. Burlington Northern Ry. Co.*, 102 F.3d 295, 298 (7th Cir.1996) (citation omitted). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). We view the record and extract all reasonable inferences from it in the light most favorable to the nonmoving party. *McGinn,* 102 F.3d at 298 (citation omitted). Only disputes that could affect the outcome of the suit under governing law will preclude an entry of judgment for the moving party. *Id.*

### 1. General Legal Principles

In order to prevail on a claim of trade dress infringement, a plaintiff must show that 1) its trade dress is either inherently distinctive or has acquired secondary meaning, and 2) that the similarity of the defendant's trade dress causes a likelihood of confusion on the part of consumers as to the source or affiliation of the products. *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 380 (7th Cir.1996) (citing *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir.1994) (other citations omitted)). If the plaintiff successfully establishes these elements, the defendant can prevail if the defendant demonstrates that the plaintiff's trade dress is functional. *Id.* The district court found that T & B failed to demonstrate either that the oval head had acquired secondary meaning or that there was a likelihood of confusion on the part of consumers, and also that, in any event, the oval head was functional and not subject to trademark protection. T & B challenges each of these findings, which we examine in turn.

### 2. Secondary Meaning

" '[S]econdary meaning' is acquired when 'in the minds of the public, the primary significance of a product feature ... is to identify the source of the product rather than the product itself.' " *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163, 115 S.Ct. 1300, 1303, 131 L.Ed.2d 248 (1995) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982)). Secondary meaning can be established "through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir.1992) (citing *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1267 (7th Cir.1989) (other citations omitted)).

Before turning to our discussion, we note that in *T & B I* we reversed a preliminary injunction issued by Magistrate Judge Guzman because we found that T & B had failed to show that the oval-shaped head had acquired secondary meaning. Our findings there, however, are not binding on us here, and were not binding on the district court when it considered the motion for summary

judgment. "A court must be cautious in adopting findings and conclusions from the preliminary injunction stage in ruling on a motion for summary judgment...." *Communications Maintenance, Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1205 (7th Cir.1985). This caution is necessary for two reasons: first, findings of fact and conclusions of law made at the preliminary injunction stage are often based on incomplete evidence and a hurried consideration of the issues; and second, different standards apply in the two contexts (reasonable likelihood of success on an injunction, and the existence of any genuine issues of material fact on summary judgment). *Id.* Therefore, we are not bound by the determinations we made in *T & B I* in our present consideration, although we view the evidence with due regard to our previous discussion.

■ T & B attacks the district court's determination that it failed to raise any issues of material fact with respect to the issue of secondary meaning. First, the district court examined T & B's advertising, noting that it "describes the utilitarian aspects of the oval head and does not encourage consumers to identify the oval head with T & B." 935 F.Supp. at 1414. This discussion was consistent with our finding in *T & B I*, in which we observed that T & B's advertising, when it did mention the oval-shaped head, was touting the functional advantages of the head. Such advertising, we noted, weighs against a finding of secondary meaning and instead supports the inference that consumers consider the claimed trade dress a desirable feature rather than an indicator of source. *T & B I*, 65 F.3d at 662. As we discuss in detail below under functionality, we now find that material questions of fact exist regarding whether T & B's advertisements tout functional aspects of the *oval shape* of the head or rather of *other aspects* of the head which could exist regardless of its shape.

■ Furthermore, T & B has presented advertisements which show the oval-shaped head without mentioning any advantages of the tie at all. *See, e.g.*, App. at 333 (photograph of ties showing oval heads), 279 (locked tie with oval head), 289 (illustration of tie with oval head). The district court noted that T & B's product manager stated that head shape was never advertised as a way to identify T & B as the producer of the ties. 935 F.Supp. at 1414. We note that this is not an accurate characterization of the testimony, which only established that he was not aware of any such advertising, not that none actually existed. *See* App. at 555. However, there is no hard-and-fast rule establishing that the shape of a product must be specifically pointed out in advertising in order for that advertising to be considered as evidence of secondary meaning.[6] As we noted in *T & B I*, advertising which encourages consumers to identify the claimed trade dress with the particular producer is some evidence of secondary meaning. 65 F.3d at 662 (citing *First Brands Corp. v. Fred Meyer*, Inc., 809 F.2d 1378, 1383 (9th Cir.1987)). While we utilized as an example of such advertising the phrase "look for the oval head," we did not establish that such explicit direction was necessary. The advertising which prominently features the oval-shaped heads of T & B's ties could also function to draw consumers' attention to the shape and to associate it with T & B. Whether it succeeded in doing so, however, is a question of fact which cannot be resolved on summary judgment. Thus, we find that the advertising presented by T & B raises material questions of fact regarding secondary meaning in this case.

■ T & B also points to affidavits it supplied to the district court, arguing that they establish that for at least some consumers the primary significance of the oval-shaped head is to denote T & B as the

---

6. In its brief, Panduit cites *Textron, Inc. v. U.S. Intern. Trade Com'n*, 753 F.2d 1019, 1027 (Fed. Cir.1985), for the proposition that the mere depiction of a configuration does not establish trademark rights through advertising. *Textron* is distinguishable, however, since it involved an appeal from a decision of the International Trade Commission (not a motion for summary judgment) and since Textron had apparently shown the silhouette of its product, not a picture of the product itself, in its advertising. We are not persuaded that *Textron* has established a *per se* rule that the feature sought to be protected must be specifically highlighted, and we decline to establish such a rule here.

manufacturer. With regard to one of the affidavits, that of E. LeRoy Larson, it appears that the district court improperly engaged in credibility determinations. In its opinion, the district court stated that Larson is employed by T & B and that, as this Circuit has noted, testimony of a party's own representative should be discounted. *See* 935 F.Supp. at 1416. However, it is not the province of the district court to so discount testimony on a motion for summary judgment; it must make all reasonable inferences in favor of the non-movant (i.e., T & B). In addition, the district court found that none of the declarants stated that they cared that the cable ties with oval heads were manufactured by T & B, and that the declarations therefore did not establish secondary meaning. 935 F.Supp. at 1416. In so finding, the district court relied on language in *T & B I*, where we stated that consumers must not only associate the form of a product with a particular producer, but also must care that the product comes from a particular producer. 65 F.3d at 658–59. Because we believe that our language caused a misunderstanding about the applicable law, we will take this opportunity to clarify our previous decision.

Rather than establishing a new test for secondary meaning, as T & B understands it, our reference to "must care" attempted to shed light on the application of the primary significance test in cases where a previously-patented product is at issue. In *T & B I*, our "must care" language was derived from *Sinko v. Snow–Craggs Corp.*, 105 F.2d 450 (7th Cir.1939), in which this court stated:

> Sinko created a desire on the part of the public for one of two things, either for knobs made by Sinko, above all other knob makers, or for knobs made in a particular manner regardless of who made them. If it is the first situation, the law of unfair competition gives Sinko the right to monopolize or to exclude other makers from copying the product. If it is the latter situation, Sinko receives no such right to monopolize, even though he might have

been the first one to make the article in the particularly desirable manner.

105 F.2d at 453. The *Sinko* case involved a different scenario than the present case, however. There, Sinko and another manufacturer, Snow–Craggs ("Cragg"), were both selling plain "Brodie knobs."[7] In 1936, Sinko threw a wrench into the machine when it began to adorn its knobs with a jewel, a practice which had been used in the automotive industry for years in connection with such items as lighters and dashboard lights. The public soon developed a fancy for the jeweled knobs, a fact noticed by Cragg. Later that same year, Cragg decided that it wanted a piece of the jeweled-knob market and attempted to enter into a supply agreement with Sinko. Negotiations failed, however, and Cragg began to manufacture jeweled knobs itself. Displeased, Sinko filed a trade dress infringement suit to stop Cragg's selling of jeweled knobs. *Sinko*, 105 F.2d at 451. The district court found in favor of Sinko, enjoining Cragg from producing the knobs; this court reversed, finding that Sinko had failed to establish that its knobs had acquired secondary meaning.

One difference between the present case and *Sinko* that we did not note in *T & B I* is the timeline involved: Sinko's jeweled knob was on the market for less than a year when Cragg began manufacturing its product, whereas T & B's oval-headed tie was produced for about 30 years before Panduit's tie came on the market (and for a period of approximately ten years between the time the Schwester patent expired and the time Panduit began developing its barbed cable tie). See App. at 225, 398. Additionally, we found in *Sinko* that the fact that jewels had been used on other automotive accessories for such a long time rendered it unlikely that a jewel could ever become an indicator of any particular manufacturer. *Sinko*, 105 F.2d at 453. In contrast, there is no evidence in this case that oval-shaped heads were widely (or even ever) used in the electrical industry prior to T & B's usage. To the extent *Sinko* required testimony establishing that consum-

---

**7.** These knobs attached to a car's steering wheel and allowed the driver to turn the car by spinning the knob rather than by turning the wheel itself. Young people of the day referred to them as "necker's knobs" since only one hand was used to turn the wheel. Power steering made the knobs obsolete.

ers care that a product comes from a particular producer to establish secondary meaning, we find that our case is factually distinguishable and that such evidence is not mandated here.

It is true, as we noted in *T & B I*, that when the first producer in the market manufactures a product under a patent (and thus, for a period, is the exclusive producer), an association between the product's trade dress and that manufacturer may be inevitable. 65 F.3d at 658–59. It is this concern we attempted to address in *T & B I*, and we believe that evidence which shows that the association between the trade dress and the manufacturer is caused by something other than the expired patent is required. Such evidence need not take the form of explicit testimony from consumers stating that "I care that X produced this product," however circumstantial evidence showing that the connection is independent of the patent is sufficient. As we discuss below, T & B did present such evidence by showing that it produced its oval-headed ties for over ten years between the time its monopoly ended and the time that any other manufacturer began making such ties. This evidence is sufficient to raise an inference that any consumer connection between oval-headed cable ties and T & B was not related to its former monopoly status.

In summary, then, we clarify our opinion in *T & B I* by stating that when a trade dress sought to be protected was formerly contained in a patent, evidence establishing secondary meaning must also show that any connection between the trade dress of the product and its producer does not primarily stem from the expired patent. This ensures that there is a true connection between the producer and the product in the minds of consumers, and avoids any problem regarding whether secondary meaning can develop during a period when competition is stifled by some other type of protection. *See Merchant & Evans*, 963 F.2d at 633 n. 3.

With this discussion in mind, the district court's determination that the distributor declarations produced by T & B failed to raise a genuine issue of fact on the issue of secondary meaning is incorrect. The court correctly noted that "[f]our distributors and two consultants, all of whom have considerable experience in the electrical industry, state unequivocally in their declarations that they recognize and associate the oval shape of T & B's two-piece, barbed cable tie with T & B and can identify products as T & B products by that oval shape." 935 F.Supp. at 1416. The court also correctly rebuffed Panduit's contention that this testimony was not relevant because the declarants were not "consumers." Citing *Sassafras Enterprises, Inc. v. Roshco, Inc.*, 915 F.Supp. 1, 7 (N.D.Ill. 1996), the court stated that when the relevant buyer class consists of dealers and ultimate consumers, the state of mind of dealers is important. *Id.* Since the complaint stated that T & B sells its products primarily through distributors, the court determined that these declarations could properly be considered. *Id.* at 1416. However, the court found that the declarations raised no issues of material fact because none of the declarants stated that they cared whether they received a Panduit tie or a T & B tie. Since, as we noted above, consumers need not provide direct testimony that they care, the determination of the district court that the declarations fail to raise an inference of secondary meaning is incorrect.

T & B also contends that the district court improperly found that a consumer survey produced by T & B was flawed and did not support an inference of secondary meaning. In support of its motion for a preliminary injunction, T & B presented a survey ("1994 survey") which we found to be flawed because it did not separate the allegedly protectable trade dress from clearly non-protectable elements. *T & B I*, 65 F.3d at 662–63. The 1994 survey asked consumers to identify the source of several cable ties by looking at the whole tie, and as the survey itself noted, many of the respondents' first responses related to the metal clip. This fact led to our conclusion that "[a] survey which asks consumers to identify the source of a product based on its overall configuration when most of the product's configuration is functional is worthless in determining whether a particular product feature has acquired secondary meaning." *Id.* Taking its cue from our dis-

cussion, T & B commissioned another survey in response to Panduit's motion for summary judgment, which again sought to test whether T & B's oval head had acquired secondary meaning. ("1996 survey"). To avoid the problems of the 1994 survey, the 1996 survey was designed to test whether shape alone acts as an indicator of source independent of any source identification arising from the overall configuration ("part I") and also to test whether the primary significance of the oval head was identifying T & B or was related to some utilitarian function ("part II"). *See* App. at 371.

The district court found, and Panduit argues here, that the 1996 survey was flawed because the interviewees were not consumers, the group the survey instructions indicate it was designed to test (App. at 390), but rather were store personnel in electrical supply stores. App. at 371. As we discussed above, when, as here, the relevant market includes both distributors and ultimate purchasers, the state of mind of dealers is important in determining if secondary meaning exists. While the fact that no ultimate consumers were surveyed may be relevant in determining the weight the survey should be given by the finder of fact, it does not render the 1996 survey meaningless for determining if secondary meaning exists. The same analysis applies to Panduit's assertion that the survey had no evidentiary value because it was designed for consumers but used on salespeople. The district court's determination that part I of the 1996 survey did not establish secondary meaning or raise any issues of fact because ultimate consumers were not interviewed is therefore incorrect.

Panduit argues on appeal that we should nevertheless ignore the 1996 survey because its results were erroneously combined with the results of the 1994 survey and because it did not test whether consumers cared about the source of the cable ties. We disposed of Panduit's second contention above, and need not discuss it again here. While we agree that the 1994 survey is flawed and should not be used in determining secondary meaning, the fact that the results of the 1994 and 1996 surveys were combined in a report detailing the findings of the 1996 survey does not

render the data meaningless. The raw numbers of people naming T & B as the manufacturer of the oval-headed tie are reported as well (*see* App. at 377), and the data can be re-analyzed to remove the offending 1994 survey results. Taking the evidence contained in the 1996 survey in a light most favorable to T & B, questions of fact are raised on the issue of secondary meaning.

■ The district court also found that part II of the 1996 survey did not establish secondary meaning, since the 30% recognition was insufficient to establish secondary meaning. The court cited *Spraying Systems*, 975 F.2d at 394, for the proposition that "[w]hile a 50–percent figure is regarded as clearly sufficient to establish secondary meaning, a figure in the thirties can only be considered marginal." 935 F.Supp. at 1415. Our discussion in *Spraying Systems*, however, did not establish that any recognition figure under 50% could not establish secondary meaning. We noted that figures in the 30% range were marginal and did not establish secondary meaning as a matter of law. Such evidence is still probative of the issue of secondary meaning, and the factfinder should weigh that fact with all of the other evidence to determine if secondary meaning exists. The district court's determinations with regard to the 1996 survey are incorrect, and the survey provides relevant evidence of secondary meaning which raises material questions of fact.

An additional factor that is important in determining secondary meaning, which the district court did not examine, is the time, if any, that T & B continuously and exclusively produced the ovalheaded cable ties. *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 789–90 (8th Cir.1995). As we discussed above, there is evidence that, at least with respect to Panduit, more than ten years passed between the time that the Schwester patent expired and the time that Panduit began manufacturing its ties. Under the Lanham Act, five years' use weighs strongly in favor of secondary meaning. *Id.* (citing 15 U.S.C. § 1052(f) (trademark commissioner may accept five years' exclusive and continuous use of a mark as prima facie evidence of secondary meaning)). *See Two Pesos*, 505

U.S. at 768, 112 S.Ct. at 2757 ("the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a).") (citations omitted). This evidence has some bearing on the issue of secondary meaning, and it should have been considered by the district court. T & B raises other such evidence not considered by the district court (e.g., volume of sales, evidence of actual confusion, etc.); however, we need not discuss it in detail in light of our determinations above. Also, Panduit's various objections that certain evidence presented by T & B is inadmissible are improper, since evidentiary questions should be brought in the district court and not for the first time on appeal. Therefore, we find that the district court erred in finding that no issues of material fact exist with respect to secondary meaning in this case.

### 3. Likelihood of Confusion

■ Even though it found that T & B had failed to demonstrate that its cable ties had acquired secondary meaning, the district court proceeded to a discussion of the likelihood of confusion. A number of factors must be examined when determining if a likelihood of confusion exists between the trade dresses of two products. These include: 1) the similarity of the trade dresses; 2) the area and manner of concurrent use; 3) the degree of care likely to be used by consumers; 4) the strength of the plaintiff's trade dress; 5) actual confusion; and 6) intent of the defendant to pass off its product as that of the plaintiff. *Dorr–Oliver*, 94 F.3d at 382 (citations omitted). When considering whether there is a likelihood of confusion, none of these factors considered alone is dispositive, and the weight to be accorded each varies from case to case. *Meridian Mutual Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir.1997) (citing *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir.1993) (other citations omitted)). When making its inquiry, the court must compare the trade dresses " 'in light of what happens in the marketplace,' not merely by looking at the two ... side-by-side." *Meridian*, 128 F.3d at 1115 (quoting

*James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir.1976)).

■ The district court did not consider all six of the aforementioned elements (indeed, it did not even mention them), but found that there was no likelihood of confusion between the litigants' cable ties. The court focused on only several pieces of evidence, including the fact that each cable tie made by Panduit and T & B has the company's respective name stamped on it. Citing the fact that the Supreme Court had found in *Kellogg*, 305 U.S. at 121, 59 S.Ct. at 114–15, that no likelihood of confusion arose even though two similar products were not individually labeled, the district court held that it would "fly in the face of established precedent" to find a likelihood of confusion here. 935 F.Supp. at 1417. This cursory discussion does not remotely fulfill the court's duty to conduct an examination in light of what occurs in the marketplace, and its finding is improper. Our examination of both T & B's ties and Panduit's ties reveals that each company embosses its name on the ties in the same color as the rest of the tie, rendering the name difficult to see. *See, e.g.*, Plaintiff's Exhs. 191 and 36B. The names are especially difficult to see on smaller ties (e.g., Plaintiff's Exhs. 34A and 35A), and can only be seen after the tie is turned and manipulated. Given our difficulty in discerning the names upon a close inspection, a question of fact exists as to whether the names stamped on each tie prevent the ties from being confused.

The district court also noted that T & B submitted an affidavit by Lloyd Francis, a T & B employee. In his affidavit, Francis stated that he regularly addresses customers' problems with T & B products. While visiting one customer, a production engineer approached him and asked what T & B had done to its ties, since problems were occurring with the metal barbs falling out. After closely inspecting the tie, Francis discovered that the broken tie was a Panduit product, not a T & B product, to which the engineer expressed surprise and puzzlement. *See* Declarations in Opposition to Motion for Summary Judgment, Rec. Doc. 252 (filed under seal). The district court dismissed this

evidence, stating that it "does not establish a likelihood of confusion." The court noted that Panduit's only obligation is to use "every reasonable means" to prevent confusion, and found that Panduit has done so. 935 F.Supp. at 1417 (quoting *Kellogg*, 305 U.S. at 121, 59 S.Ct. at 114–15). This finding is inappropriate and suggests that the court engaged in weighing the evidence, which is improper on a motion for summary judgment. The affidavit establishes that actual confusion has taken place between Panduit and T & B ties, and we have held that evidence of actual confusion, where it exists, is entitled to substantial weight. *Meridian*, 128 F.3d at 1118 (citations omitted). The decision of how much weight such evidence should be given is the province of the fact finder, not the court on a motion for summary judgment. Similarly, whether Panduit did all that it can to prevent confusion is an issue that is not properly decided at present. These findings by the district court are improper at this stage of the proceedings, and material issues of fact exist.

Similarly, the district court found (without much elaboration) that Panduit's labeling and packaging distinguish its ties from those of T & B. T & B picked up this theme in its brief, arguing that packaging is immaterial because regardless of packaging, post-sale confusion is likely to occur. We have previously recognized that post-sale confusion can precipitate a cause of action for trademark infringement, *Libman Co. v. Vining Industries, Inc.*, 69 F.3d 1360, 1362–63 (7th Cir. 1995), *cert. denied*, 517 U.S. 1234, 116 S.Ct. 1878, 135 L.Ed.2d 173 (1996), and T & B presented evidence which showed that the companies' packaging would not avoid such confusion. Both T & B and Panduit sell their cable ties in bulk packages (i.e., packages containing a large quantity of ties) marked with a label containing their respective names. Evidence presented by T & B showed, however, that some distributors break up the bulk packages, repackaging the cable ties for sale in smaller quantities. *See* App. at 154 (testimony of James Taggart) and 171 (testimony of William O'Neill). This evidence counters Panduit's arguments that packaging eliminates any likelihood of confu-

sion between the companies' products, and raises issues of fact in this respect as well.

The parties raise some additional arguments in their briefs, but we need not discuss them here since no one factor is controlling and all of the factors must be weighed as a whole. We find, therefore, that the district court erroneously determined that no issues of fact remained with respect to the likelihood of confusion between the products of T & B and Panduit.

### 4. Functionality

▮ Finally, the district court also looked to whether the oval-shaped head of T & B's cable tie is functional. Even though we have found that questions of fact exist with regard to the issues of secondary meaning and likelihood of confusion, summary judgment may still have been properly granted in Panduit's favor. This is because an affirmative defense exists to trade dress infringement: if the defendant can demonstrate that the element sought to be protected is functional, the plaintiff loses. *Badger Meter*, 13 F.3d at 1151 n. 5; *Dorr–Oliver*, 94 F.3d at 380. The district court found that Panduit satisfied its burden of proof and demonstrated that the oval-shaped head was functional, entitling Panduit to judgment as a matter of law. As with the district court's other determinations, we review this issue *de novo*.

▮ In this Circuit, a "feature is functional if it is one that is costly to design around or to do without, rather than one that is costly to have." *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1189 (7th Cir.1989) (citing *W.T. Rogers*, 778 F.2d 334). The fact that the feature at issue serves some function is not enough; to be functional in the trade dress sense, the feature must be "necessary to afford a competitor the means to compete effectively." *Id.* at 1188. In *W.T. Rogers*, we discussed the concept of functionality as follows:

> If the feature is ornamental, fanciful, decorative, like the patterns on a piece of china or of silverware, then the manufacturer can use it as his name, his symbol, his identifying mark. Ornamental, fanciful shapes and patterns are not in short sup-

ply, so appropriating one of them to serve as an identifying mark does not take away from any competitor something that he needs in order to make a competing brand. But if the feature is not ornamental or fanciful or whimsical or arbitrary, but is somehow intrinsic to the entire product consisting of this manufacturer's brand and his rivals' brands, trademark protection will be denied. The name of this principle is "functionality".... Thus the first company to make an airplane cannot use the characteristic shape of an airplane as its trademark, thereby condemning its rivals to build airplanes that won't fly.... A firm that makes footballs could not use as its trademark the characteristic oval shape of the football, thereby forcing its rivals to find another shape for their footballs; since they wouldn't be able to sell any round or oblong or hexagonal footballs, that firm would have, not an identifying mark, but a product monopoly, and a product monopoly not for a term of years as under the patent laws but forever.

The football's oval shape is "functional" in the following practical sense: it would be found in all or most brands of the product even if no producer had any desire to have his brand mistaken for that of another producer. A feature functional in this sense—a feature that different brands share rather than a feature designed to differentiate the brands—is unlike those dispensable features of the particular brand that, like an arbitrary identifying name, rivals do not need in order to compete effectively. So if an automobile manufacturer places at the front end of its hood a statue of Mercury, it can if it wants make this its trademark (or one of its trademarks), because its competitors do not need a statue of Mercury on the hoods of their cars in order to be able to compete. To put this differently, a functional feature is one which competitors would have to spend money not to copy but to design around, as they would have to do if they wanted to come up with a nonoval substitute for a football. It is something costly to do without (like the hood itself),

rather than costly to have (like the statue of Mercury).

*W.T. Rogers,* 778 F.2d at 339 (citations omitted).

 If the defendant is able to show that the feature which assertedly gives a product distinctiveness is one " 'of a few superior designs for its *de facto* purpose, it follows that competition is hindered' ... and trademark protection will be denied." *W.T. Rogers,* 778 F.2d at 340 (quoting *In re Bose Corp.,* 772 F.2d 866, 872 (Fed.Cir.1985)). Panduit attempted to follow this route in part, arguing in the district court that all of the cable ties on the market have either oval or square heads (with slight variation). *See* Panduit's Memorandum in Support of Motion for Summary Judgment at 11–12. In response, T & B introduced into evidence other head shapes that could be utilized on a cable tie and which would fit within the government specifications. *See* App. at 511–25. Panduit attacks these alternative designs in several respects, first by arguing that T & B's own expert, Michael Lazar ("Lazar"), testified that the shapes would not operate as drawn. "Because they are inoperable," Panduit argues, "they are not alternative shapes with which Panduit could 'compete effectively,' and properly were not considered by the lower court." *See* Appellee's Brief at 22. T & B presented contrary explanatory evidence in the district court, raising material issues of fact with regard to these alternate designs. From the drawings, it is clear that the tail end is too wide to fit through the aperture in the cable tie head (*see, e.g.,* App. at 511). However, Lazar noted that this problem arose because "[i]t appears to be drawn incorrectly," and did not admit that the proffered designs were fatally flawed. *See* App. at 564. Indeed, Lazar stated that "these are merely illustrative and not necessarily based on any finite dimensions. They merely illustrate a concept rather than a finite design." *Id.* Thus, the fact that the alternate shapes may not operate as *drawn* does not settle the question of whether such designs could be effectively marketed, and a material issue of fact exists.

Panduit also stresses that there are only a finite number [8] of shapes in which cable ties can be made and still fit within military specifications, and also that at present all of the cable ties on the market have either essentially square or oval heads. As such, Panduit argues, it cannot compete effectively in the cable tie market if it cannot use an oval-shaped head. *See* Appellee's Brief at 25. The fact that only several shapes are currently on the market, however, does not establish as a matter of law that the oval shape is functional. As we have found in the past, the fact that several (or even only one) shape is currently marketed is relevant to, but not dispositive of, the functionality issue. Other factors, including the effect upon retail price and the costs which Panduit would incur if forced to use a head shape other than oval, must also be considered. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 22 (7th Cir.1992). The district court noted in its decision that T & B had presented evidence that: 1) the hypothetical shapes would use an equal or smaller amount of material as the oval-shaped ties; 2) the alternative shapes would cost the same or less to manufacture; and 3) while round edges on a cable tie are important for comfort and ease of molding the ties, oval edges were not necessary. 935 F.Supp. at 1412–13. Despite this evidence, the court found that because none of the shapes had ever been successfully marketed, the oval shape was functional. There is no requirement that the alternative shapes must have been successfully marketed in order to show that effective competition is possible; several factors (as those noted above) must be examined in reaching that decision. The evidence presented by T & B raises questions about whether cable ties with shapes other than rectangular or oval could compete effectively, and Panduit did not meet its burden of proof on showing that the oval shape is functional as a matter of law.

Panduit also argues that we have already dismissed the relevance of the hypothetical designs offered by T & B in our previous opinion in this case. Therein, we stated that:

In any event whether one could draw or even produce cable ties with all these different head shapes is irrelevant, because the issue is whether or not one could "compete effectively" selling such cable ties. *Schwinn*, 870 F.2d at 1190. Neither T & B nor Lazar's former employer, Burndy, ever successfully marketed a cable tie with anything but a rectangular or an oval head.

*T & B I*, 65 F.3d at 661 n. 6. However, as we noted in *T & B I*, our determination that a preliminary injunction had erroneously issued was based on a finding that T & B had failed to establish that the oval head had secondary meaning. While we expressed concern about the district judge's findings on likelihood of confusion and nonfunctionality, the issue to which the above-quoted language was directed, those elements did not play a role in our dissolving the preliminary injunction and our discussion of them is dicta rather than the law of the case. *See T & B I*, 65 F.3d at 661. As discussed above, evidence was presented which shows that the hypothetical shapes could be produced for the same (or less) cost as T & B's oval ties, and that these shapes would fit within the military specifications which seem so important in this industry. When there are numerous possible constructions of a product, the nature, price, and utility of such constructions are material issues of fact not well-suited for determination at the summary judgment stage. *Brandir Int'l, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142, 1148 (2d Cir. 1987). It once again appears that the district court engaged in evidence-weighing, and its conclusion is inappropriate.

Panduit additionally argues that T & B emphasized the functional aspects of the oval head in its advertisements and promotional materials, thus showing that the shape is functional, a position with which the district court agreed. For one, Panduit shows that T & B's advertising rack includes information about the functional value of the oval head, stating: "Low profile head—won't snag, looks good." *See* App. at 598. Statements in other such promotional materials which Panduit says point out that the oval-shaped head is functional include the following: two cata-

---

8. The parties' briefs and appendices are subject to a confidentiality agreement and, accordingly, both parties have filed confidential and nonconfi- dential versions. Where necessary, as here, we have omitted confidential information from this opinion.

logs point out that the tie has a "small head" and that its "molded smooth edges enhance the appearance" (App. at 633 and 642); another catalog states that "TY–RAP cable ties have no sharp edges but feature a rounded edge" (App. at 650); and T & B's trade show display notes that the "Low profile rounded head ... won't snag" (App. at 660). In response, T & B presented evidence that the references to "small head" and "low profile" referred to the height, not the shape, of the head. *See* App. at 171; 674–75. Similarly, T & B presented evidence that the references to "rounded edge" referred to the corners of the cable tie head, not the fact that the head had an overall round shape. *See* App. at 172–75; 213–14. T & B also points to one of Panduit's ads, in which the "smooth, round edges" of its PAN–TY product are touted. *See* App. at 403. The cable tie in the illustration, however, has a rectangular or square-shaped head, not an oval head. Thus, material questions of fact exist as to whether the statements raised by Panduit refer to functional advantages of an oval-shaped head or to other features of the cable tie.

The district court also mentioned that the oval shape was contained in the Schwester patent and thus serves as evidence of functionality. While this is true, it is also true that "[a] utility patent must be examined in detail to determine whether or not the disclosed configuration is really primarily functional or just incidentally appears in the disclosure of a patent." J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition § 6:10 (4th ed.1996). The district court found that because the oval shape was part of the patent and did not appear incidentally, it was primarily functional. This finding necessitated a weighing of the evidence, however, and the finder of fact should decide, in light of the other evidence presented, how much weight the Schwester patent should receive. The parties also raise other issues in their briefs, but they do not merit individual discussion since we do not believe that any of them would be determinative in this case. Therefore, because we find that

material questions of fact exist regarding the functionality of T & B's oval shaped head, Panduit has not established its affirmative defense. In addition, as we found above, material questions of fact also exist with respect to elements of T & B's claim of trade dress infringement. The district court's judgment in favor of Panduit on T & B's trade dress infringement claim must therefore be reversed, and this case remanded for a trial on the merits.

### III. Cancellation of Panduit's Barb–Ty Trademark

In its complaint, T & B also sought the cancellation of Panduit's trademark "BARB–TY," arguing that it was a generic term or, alternatively, that registration had been obtained fraudulently. The district court granted summary judgment to Panduit on this count as well, finding that T & B had failed to present a genuine issue of fact as to either contention. *Thomas & Betts Corp. v. Panduit Corp.*, 940 F.Supp. 1337 (N.D.Ill. 1996). T & B takes issue with the district court's decision, arguing that material issues of fact do exist with regard to whether "barb tie" (or its phonetic equivalent, BARB–TY) is generic.[9]

For purposes of trademark law, a generic term is one "that denotes the product rather than any of the brands of the product." *Door Systems, Inc. v. Pro–Line Door Systems, Inc.*, 83 F.3d 169, 171 (7th Cir.1996) (citing *Two Pesos*, 505 U.S. at 768, 112 S.Ct. at 2757) (other citations omitted). While a trademark identifies the source of a product, "a generic term merely specifies the genus of which the particular product is a species." *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir.1986) (citations omitted). Whether a term is generic or can be trademarked is a question of fact. *Door Systems*, 83 F.3d at 171 (citing *Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.*, 76 F.3d 743, 748 (6th Cir. 1996) and *Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co., Inc.*, 9 F.3d 175,

9. T & B does not present any arguments in its brief relating to the fraudulent procurement claim, and as such we need not address it. *Ricci v. Arlington Heights, Ill.*, 116 F.3d 288, 292 (7th Cir.1997), *cert. granted,* — U.S. —, 118 S.Ct. 679, 139 L.Ed.2d 627 (1998) (arguments not raised in brief are deemed waived).

180 (1st Cir.1993)). As with any question of fact, however, genericness can be resolved on summary judgment if "the evidence is so one-sided that there can be no doubt about how the question can be answered." *Door Systems,* 83 F.3d at 171.

■ T & B attacks the district court's grant of summary judgment to Panduit on Count II in several respects. First, T & B argues that, contrary to the district court's holding, Panduit was not entitled to a presumption of nongenericness of its "BARB–TY" trademark. The Lanham Act provides that registration of a mark on the principal register is *prima facie* evidence of its validity. 15 U.S.C. § 1115(a); *see also* 15 U.S.C. § 1057(b) (same). As we have explained, this section "entitles the plaintiff to a presumption that its registered trademark is not merely descriptive or generic, or, if merely descriptive, is accorded secondary meaning." *Liquid Controls Corp.,* 802 F.2d at 936. T & B does not dispute the existence of the presumption, but rather argues that it should not apply because T & B had filed its complaint in this case before Panduit's registration issued. See Appellants' Brief at 44. No case law is cited to support this proposition, and we therefore deem this argument waived pursuant to Fed.R.App.P. 28(a)(6). *See Griffin v. City of Milwaukee,* 74 F.3d 824, 828 (7th Cir.1996) (arguments unsupported by any legal basis are deemed waived) (citations omitted). Thus we, as the district court, apply a presumption of validity (and nongenericness) to Panduit's "BARB–TY" trademark.

■ In any event, as T & B correctly notes, the presumption of validity can be rebutted. For this to occur, T & B must meet its burden by providing proof of genericness (or, at the summary judgment stage, by raising genuine issues of material fact with respect to the issue of genericness). *Liquid Controls Corp.,* 802 F.2d at 936–37. Under the Lanham Act,

A registered mark shall not be deemed to be the generic name of goods or services solely because such mark is also used as a name of or to identify a unique product or service. The primary significance of the registered mark to the relevant public rather than purchaser motivation shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used.

15 U.S.C. § 1064(3). The term "relevant public," as used in the statutory test, refers to the relevant public which purchases (or may purchase) the goods in the marketplace. *Magic Wand, Inc. v. RDB, Inc.,* 940 F.2d 638, 640 (Fed.Cir.1991). In simple terms, this test asks "[w]hat do the buyers understand by the word for whose use the parties are contending?" *Id.* (quoting *Bayer Co. v. United Drug Co.,* 272 F. 505, 509 (S.D.N.Y. 1921)). In order to demonstrate that a term is or has become generic, evidence can come in the form of direct testimony of consumers, consumer surveys, dictionary listings, and usage in newspapers and other publications. *Magic Wand,* 940 F.2d at 641. The district court found that T & B had failed to raise any material issues of fact, and T & B argues that this finding was in error.

As the district court correctly noted, T & B did not provide a customer survey on the primary significance of the term "barb tie" in consumers' minds, did not present any direct evidence from consumers regarding the term, and did not show that it had ever used the term "barb tie" in its own advertisements. The court relied in part on the fact that the testimony regarding genericness "consists largely of testimony from their distributors and employees" in determining that "barb tie" was not generic, and also considered the fact that the term "barb tie" was not used in the Schwester patent and that other terms are used to describe the products made by T & B and Panduit. Despite the weakness of the evidence presented by T & B, however, we find that issues of material fact remain on the topic of genericness and that summary judgment was inappropriate here.

T & B points to certain of Panduit's advertisements in which the term "barb tie" is used in some manner, arguing that this usage establishes the genericness of "BARB–TY." *See, e.g.,* App. at 341 ("Highest loop tensile strength stainless steel barb tie"); 345 ("for those users who prefer a metal barb

tie"); 349 ("Lowest threading force of any metal barb tie"); 396 ("designed for users who prefer stainless steel barb ties"). Panduit counters that these phrases can only be reasonably interpreted as, for example, "metal barb" "tie", not "metal" "barb tie." *See* Appellee's Brief at 49. Such interpretation, however, is not properly undertaken by a court on summary judgment but must be left for the finder of fact. In a similar vein, T & B presented testimony from several of its employees and distributors showing that the term "barb tie" has been used by customers to identify cable ties. *See, e.g.*, App. at 100, 148, 156, 161. Despite the district court's finding that this testimony did not establish that the public perceives "barb tie" as a generic term, we believe that it raises material questions of fact about what the purchasing public understands the term to mean. Thus, the district court erroneously found that no questions of material fact exist with respect to the issue of genericness.

We realize that a gander at the evidence presented by T & B reveals that it is far from overwhelming. However, as we have repeatedly recognized, summary judgment is not the place to resolve evidentiary conflicts. "Before it can properly be granted, therefore, the court must have a very high degree of confidence that any disagreement over the facts is spurious." *Door Systems, Inc.*, 83 F.3d at 170. After reviewing the evidence presented by T & B, we do not have such a high degree of confidence, and we find that material issues of fact, especially in terms of the weight evidence should be given, remain on the issue of genericness and whether T & B has been able to overcome the presumption of validity in favor of Panduit. We therefore reverse the district court's grant of summary judgment to Panduit on Count II of the complaint.

### IV. Denial of T & B's Rule 60(b) Motion

Finally, T & B challenges the district court's denial of its motion pursuant to Fed. R.Civ.P. 60(b), in which T & B sought relief from the district court's judgment in favor of Panduit. In light of the fact that we are reversing the underlying judgment from which T & B sought relief in its motion, we vacate the district court's denial of T & B's Rule 60(b) motion.

### CONCLUSION

For the reasons set forth above, the district court's grant of summary judgment to the defendant is REVERSED, its denial of T & B's Rule 60(b) motion is VACATED, and this case is REMANDED for further proceedings consistent with this opinion.