**AERO INDUSTRIES, INC.**
Plaintiff/Counterclaim
Defendant,

v.

**JOHN DONOVAN ENTERPRISES–FLORIDA, INC., Defendant/Counterclaim Plaintiff.**

**No. IP 99–0671 C–M/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 22, 1999.

John F. Anderson, Richards McGettigan Reilly & West, Alexandria, VA, Christopher Smith, Hagemier Allen & Smith, Indianapolis, IN, Nancy G. Tinsley, Baker & Daniels, Indianapolis, IN, for plaintiff.

Steven P. Schad, Banner & witcoff, Washington, DC, Charles W. Shifley, Banner & Witcoff, Chicago, IL, Lynn C. Tyler, Barnes & Thornburg, Indianapolis, IN, for defendant.

### ORDER ON MOTION FOR PRELIMINARY INJUNCTION

McKINNEY, District Judge.

This matter is before the Court on the verified motion filed by defendant/counterclaim plaintiff John Donovan Enterprises–Florida, Inc. ("Donovan"), on August 31, 1999, seeking preliminary injunctive relief against Aero Industries, Inc. ("Aero") under Fed.R.Civ.P. 65. It is based on 35 U.S.C. § 283, which authorizes courts to grant injunctive relief "to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. This Court held a hearing on October 19 and 20, 1999, during which the parties offered both live and deposition testimony, introduced their physical and documentary evidence, and presented arguments with respect to the issues raised by the pending motion. Having thoroughly reviewed the evidence and considered the arguments, the Court has decided to **GRANT** the motion for a preliminary injunction against Aero, as further explained below.

### I. FACTUAL AND PROCEDURAL BACKGROUND [1]

The parties in this patent infringement dispute are direct competitors in a tight market in which changes in technology occur frequently. Aero, an Indianapolis-based company engaged in the manufacture and sale of products for the trucking industry, makes and sells air return bulkheads. Donovan, a Florida-based company, does the same. An air return bulkhead is used in refrigerated truck trailers to facilitate the circulation of air from the trailer into a refrigeration unit mounted on the front wall of the trailer. Hrg. Tr. at 182, Henning Cross–Exam.; Def's Ex. 4, Declaration of Greg Onken ("Onken

---

1. At this relatively early stage in these proceedings, the background given is a summary of the allegations of the complaint, preliminary findings from the evidentiary hearing, and an account of the significant procedural history. *See Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 292 (7th Cir.1998) (noting difference between findings of fact and conclusions of law at preliminary injunction stage and summary judgment stage).

Decl."), ¶ 1. It does this primarily by creating a vertical space between the front wall of the trailer and the bulkhead face, against which cargo can be loaded. *Id.* Refrigeration units are usually positioned near the top of the front wall, with an outlet for the cooled air at the top of the unit and the intake for return air at the bottom. Such bulkheads also protect both the refrigeration unit and the front wall of the trailer from damage caused by forklifts or by shifting cargo loads. Aero's Proposed Findings of Fact and Conclusions of Law ("Aero's Find.") ¶ 4; Def. Donovan's *Post–Hrg.* Proposed Findings of Fact and Conclusions of Law ("Donovan's Find.") ¶ 24.

The patent in dispute, issued to Greg Onken on September 15, 1998, is for a one-piece "Air Return Bulkhead," that can be cut to fit around differently-sized refrigeration units. Def.'s Ex. 1, United States Patent 5,807,046 (the " '046 Patent" or "Onken Patent"); Onken Decl. ¶ 2. The invention claimed in the Onken Patent is directed at solving several problems identified in the prior art. First, it is intended to eliminate the problem of "short cycling" that occurs with the open lattice-work style of bulkheads. Short cycling is when cooled air from the refrigeration unit output is pulled down through the bulkhead to the refrigerator's intake opening, and the thermostat gets a false temperature reading causing the refrigerator to shut down prematurely. '046 Patent, Col. 3, *ll.* 62–67, Col. 4, *l.* 1. Although the prior art false-wall type of bulkheads reduced the incidence of short cycling, they did not allow air to flow against and cool the adjacent cargo, which caused an inefficient distribution of the cooled air. *Id.,* Col. 4, *ll.* 1–6. The claimed invention comprises a false wall that allows air to flow against cargo resting adjacent to it without causing short cycling. *Id.,* Col. 7, *ll.* 52–54.

Another disadvantage of the prior art bulkheads was the amount of time needed to install or replace them, leading to economic losses while the trailer was unavailable for use. *Id.,* Col. 4, *ll.* 10–13. The claimed invention is a lightweight, one-piece plastic bulkhead that can be installed quickly and easily, alleviating this problem. *Id.,* Col. 7, *ll.* 50–52; Hrg. Tr. at 36. Other problems with the prior art bulkheads included their awkward size and the necessity of stocking different sizes to fit various trailers and refrigeration units, which made it difficult or expensive to ship, store or display them. *Id.,* Col. 4, *ll.* 22–47. In addition, they would bend, crack or splinter during use, causing sharp edges that could catch on or damage cargo, and were susceptible to clogging when loose shipping materials caught in the air inlets. *Id.,* Col. 4, *ll.* 48–62. Finally, the prior art bulkheads were easily damaged by shifting cargo loads or forklift collisions, and were heavy, expensive to manufacture, constructed of materials that did not meet the U.S. Department of Agriculture ("USDA") standards for contact with foodstuffs, and would rust, mildew or rot. *Id.,* Col. 4, *ll.* 63–67, Col. 5, ll. 1–9.

In contrast, the Onken Patent claimed an air return bulkhead constructed of a lightweight plastic material that resists rust, mildew and rot, withstands collisions with forklifts, and supports the weight of the cargo adjacent to it. *Id.,* Col. 7, *ll.* 55–62, Col. 8, *ll.* 1–10. Moreover, it is designed to decrease manufacturing costs because "a single bulkhead is capable of fitting any size of trailer and refrigerator." *Id.,* Col. 7, *ll.* 45–47. It can be installed in less than fifteen minutes, is lightweight and can be stacked in "interfitting relation for easy storage and display." *Id.,* Col. 7, *ll.* 50–65. Finally, the Onken invention can be made of high molecular weight polyethylene, or similar materials that can be approved by the USDA for contact with foodstuffs. '046 Patent, Col. 8, *ll.* 4–9.

Onken first introduced a one-piece air return bulkhead in 1995, calling it the Air-Head Flex System and selling it through his recently incorporated distribution company, Air Flo Products, Inc. Onken Decl. ¶¶ 16, 22. He advertised the AirHead in the November 1995 buyer's edition of a trade magazine called *Refrigerated Trans-*

*porter. Id.* ¶ 22; Def's Ex. 13. At about the same time, Aero introduced an improved solid-style bulkhead, the AerGuard, which was a partially preassembled bulkhead using heavy-duty extruded aluminum Z-posts covered by fiberglass reinforced plywood panels. Hrg. Tr. at 31–32. The AerGuard was advertised in the same issue of *Refrigerated Transporter.* Def's Ex. 13. Although partially pre-assembled, the AerGuard bulkheads contained multiple pieces to be installed, and customers found them to be heavy, bulky, and difficult to store and display. Def's Ex. 9, Decl. of John Dietrick ("Dietrick Decl."), ¶ 8.

In March of 1996, Onken exhibited his new one-piece plastic bulkhead at the Mid–America trucking show in Louisville, Kentucky. Onken Decl. ¶ 22. His company, Air Flo Products, was the only distributor at that show displaying such a bulkhead. *Id.* After the show, sales of the one-piece AirHead bulkheads "took off," and Air Flo Products was able to capture market share from larger, more established competitors, such as Aero and Donovan. *Id.* ¶ 23. Onken had filed a patent application for his one-piece air return bulkhead on February 26, 1996, just before the March trucking show. *Id.* ¶ 2.

Aero's president, James Tuerk ("Tuerk"), testified that he first learned about the one-piece AirHead bulkhead product in late 1995 or early 1996, but he does not recall seeing it at the March 1996 truck show in Louisville. Hrg. Tr. at 150, 200–01. Because he was not sure how successful this product would be, Tuerk decided to "just kind of [sit] on it." *Id.* at 201. However, sometime between the trucking show and June 29, 1996, Tuerk decided to have his research and development department design a one-piece plastic bulkhead for Aero. *Id.* at 148, 150. Aero sales people had been complaining to Tuerk that they were losing sales of Aero's solid bulkheads to the AirHead one-piece product. Hrg. Tr. at 151. The AirHead was selling well because it was cheaper and easier to install. *Id.* at 152–53. Before he decided to develop a one-piece

product, Tuerk had viewed an installation video and sales literature for the AirHead, both of which were shown to the Aero designers developing Aero's one-piece bulkhead. *Id.* at 172–74. In fact, Steven Henning ("Henning"), an Aero designer involved in developing the one-piece plastic bulkhead, stated that Aero's decision to make its own one-piece bulkhead, and the designing of models for the prototype, occurred after Henning had seen the AirHead installation video. Hrg. Tr. at 175–76.

Tuerk communicated with his patent attorney, Lawrence Laubscher ("Laubscher"), about applying for a patent for Aero's one-piece bulkhead currently in development. Def's Ex. 7, Letter dated June 29, 1996. An initial application was filed on August 21, 1996, but it was subsequently abandoned. Def's Ex. 6, United States Patent No. 5,769,704 (" '704 Patent") at 1. Another application was filed on February 18, 1997, with Henning listed as the inventor. *Id.* There is no dispute that the patent issuing from this application on June 23, 1998, the '704 Patent, covers the AerGuard II and III bulkheads by Aero. Hrg. Tr. at 94–95; Aero's Find. ¶ 10; Aero's Ex. 27, Tuerk Decl. ¶ 10. Onken's Patent was not issued until nearly three months later, September 15, 1998. Def's Ex. 1, '046 Patent at 1.

After Aero displayed its one-piece bulkhead at the 1997 Mid–America trucking show in Louisville, its president, Tuerk, received a letter from Onken's counsel informing him of Onken's pending patent application. *Id.* at 154–55. The letter also accused the product Aero displayed at the truck show of being "similar or identical to" the AirHead bulkheads distributed by Air Flo Products. Def's Ex. 90, Letter dated Mar. 31, 1997. The AirHead bulkheads are allegedly the commercial embodiments of the device claimed in Onken's patent application. *Id.* Onken's counsel warned that "Aero's manufacture, use and sale of these bulkheads may be grounds for a patent infringement dispute ... if

and when a patent issues from the [Onken] application." *Id.* Despite receiving this letter, Tuerk and Aero continued to develop, market and sell the AerGuard II bulkhead, which was the first of Aero's one-piece bulkheads. Hrg. Tr. at 194–95.

The highly competitive market in which Aero and Donovan compete, according to Tuerk, is marked by constant change, with new products often replacing old ones and a short product life span. Hrg. Tr. at 163. It comes as no surprise then that Donovan was developing a one-piece plastic bulkhead at about the same time that Aero was doing so, introducing it sometime in 1997. Hrg. Tr. at 67. In fact, of the four major competitors in the bulkhead industry—Aero, Donovan, Thermo King and F/G Products, Inc.—three developed and introduced a one-piece plastic bulkhead in 1997, a year after Onken first exhibited his new product at the Louisville show. Hrg. Tr. at 16, 65, 70, 192, 194. Scott Klager ("Klager"), Donovan's general manager, testified that Donovan's MaxAir bulkhead, introduced in 1997, was developed "off of [the AirHead] design," which was the "standard in the industry" and a "proven leader." Hrg. Tr. at 78. There is no evidence that Donovan pursued a patent of its own for the MaxAir bulkhead.

Shortly after Onken's Patent issued, his counsel sent another letter to Aero's counsel, informing Aero that the '046 Patent had issued on September 15, 1998, and that the air return bulkhead Aero made and sold infringed it. Def's Ex. 19, Letter dated Sept. 23, 1998. Air Flo Products, the exclusive licensee of the Onken Patent, offered to discuss the possibility of sublicensing the patent to Aero in return for a "reasonable royalty." *Id.* In response, Laubscher inquired about the proposed licensing terms. Def's Ex. 20, Fax dated Dec. 16, 1998.

At about the same time, Donovan entered discussions with Onken and Air Flo Products, presumably because Onken had accused Donovan's MaxAir bulkhead of infringing the '046 Patent as well.[2] Onken Decl. ¶¶ 26, 27. Onken also offered to license the '046 Patent to Donovan, while the two discussed the possibility of Donovan purchasing Air Flo Products and the '046 Patent. *Id.* ¶ 27. By early 1999, Donovan and Onken had reached an agreement on the licensing terms and the '046 Patent was licensed to Donovan. *Id.* A couple of months later Onken sold all the assets of Air Flo Products, including the '046 Patent, to Donovan. *Id.* Donovan pays Onken a royalty for each bulkhead it sells that uses the '046 Patent's design. *Id.*

Once it acquired Air Flo Products and the Onken Patent, Donovan wrote to Aero's counsel, Laubscher, to inform him about the change in patent ownership, and to assert a claim of infringement against Aero for its AerGuard II and AerGuard III. Def's Ex. 21, Letter dated Mar. 2, 1999. Donovan's letter insisted that Aero "cease and desist from all further infringing activities, including the manufacture, use and sale of air return bulkheads covered by [the '046 Patent]." *Id.* Referencing Laubscher's December 16, 1998, letter inquiring about potential licensing terms, Donovan indicated it may be willing to consider a license "under appropriate terms." *Id.* Aero was asked to let Donovan know by March 26, 1999, if it was interested in discussing licensing the patent. *Id.*

Aero's president, Tuerk, entered into negotiations with Donovan's president, Michael Ciferri regarding possible licensing, but by April 21, 1999, it was apparent their talks would be unsuccessful. Hrg. Tr. at 207; Def's Ex. 22, Letter to Laubscher

---

**2.** Although no copy of a letter to Donovan has been produced, it is reasonable to infer that Onken's counsel sent a letter of notice to every manufacturer that was selling a one-piece plastic air return bulkhead after the Onken Patent issued. *See* Aero's Ex. 18, Letter dated Feb. 12, 1998, from Ingersoll–Rand (Thermo King) to Onken's counsel; Aero's Ex. 19, Letter dated Dec. 2, 1998, from Ingersoll–Rand to Onken's counsel; Aero's Ex. 21, Letter dated Oct. 13, 1998, from F/G Products, Inc.'s counsel to Onken's counsel.

dated Apr. 21, 1999; Def's Ex. 23, Letter to Tuerk dated Apr. 21, 1999. A complaint was filed by Aero on May 11, 1999, seeking a declaratory judgment that the '046 Patent is invalid, unenforceable and not infringed by the AerGuard products. Donovan answered Aero's complaint on June 4, 1999, and included a counterclaim for infringement of the '046 Patent. On June 30, 1999, Aero filed an amended complaint with leave of the Court, in which it claims infringement by Donovan's bulkheads of the '704 Patent. The pending motion for a preliminary injunction was filed by Donovan on August 31, 1999. Further facts will be discussed as the analysis warrants.

## II. DISCUSSION

### A. Standards

■ A preliminary injunction is an extraordinary remedy. *Eli Lilly and Co. v. American Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed.Cir.1996). In order to be entitled to such relief in a patent case, a plaintiff must show:

(1) a reasonable likelihood of success on the merits;

(2) irreparable harm;

(3) the balance of hardships tipping in its favor; and

(4) the impact of the injunction on the public interest.

*Hybritech Inc. v. Abbott Lab.*, 849 F.2d 1446, 1451 (Fed.Cir.1988). These factors must be balanced against each other and against the magnitude of the relief sought. *Id.* The injunction will not issue if the factors do not favor the movant. In addition, the party seeking the injunction has the burden of proving entitlement to such relief. *Reebok Intern. Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed.Cir.1994).

Although courts should make findings with respect to each of the four factors and weigh them against each other, it is not always necessary to make findings about the relative harms and the public interest when a movant has failed to carry its burden on the first two crucial factors. *Id.* at 1556 (declining "to require a district court to articulate findings on the third and fourth factors when the court *denies* a preliminary injunction because a party fails to establish *either* of the two critical factors"(emphasis in the original)). On the other hand, when a court grants a preliminary injunction, it must make findings on all four factors. *Id.* A movant who clearly establishes the first factor, however, will enjoy the benefit of a presumption on the second. *Id.* The presumption is rebuttable. Moreover, it does not even arise unless there is a strong showing of a likelihood of success on the merits. *Id.* Logically then, any preliminary injunction analysis should begin with determining the plaintiff's likelihood of success on the merits.

### B. Likelihood of Success on the Merits

■ This determination requires a reasonable showing of both validity of the patent and its infringement. *Reebok*, 32 F.3d at 1555. The validity of the Onken Patent has not been established in any prior adjudication, as the patent is relatively new. Consequently, the Court must address whether Aero has presented sufficient evidence from which it could support its invalidity defense. *See C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1348 (Fed. Cir.), *reh'g denied*, 161 F.3d 1380 (1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1804, 143 L.Ed.2d 1008 (1999). Although Donovan correctly notes that a patent is presumed to be valid, 35 U.S.C. § 282, that presumption merely gives a patent holder the right to have validity judged by whether the challenger's evidence is sufficient to meet a clear and convincing standard. *See PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed.Cir.1996); *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 882 (Fed.Cir. 1992) (noting that presumption of validity "acts as procedural device which places the burden of going forward with evidence and the ultimate burden of persuasion of invalidity at trial on the alleged infringer.").

■ With respect to infringement, the parties primarily dispute whether two ele-

ments of the claims read on the AerGuard II and III products, the support column and the support flute elements.[3] For purposes of this motion only and on a preliminary basis, the Court will construe those elements of the patent without benefit of any *Markman* evidence or argument. Because the findings of fact and conclusions of law made at this stage of the litigation tend to be "based on incomplete evidence and a hurried consideration of the issues," they are not binding for *Markman* purposes or for a summary judgment motion. *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 336, 142 L.Ed.2d 277 (1998). With this caution in mind, the Court now turns to a preliminary consideration of the merits.

### 1. Infringement

■ To predict the likelihood of success on the merits, the Court must assess whether Donovan can show by a preponderance of the evidence that every limitation of the claim asserted to be infringed has been found in the accused product, either literally or by an equivalent. *Becton·Dickinson and Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed.Cir.1990); *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935 (Fed.Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988) and 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988). The determination of infringement requires two steps. First, the court must interpret the disputed claims, "from a study of all relevant patent documents," to determine their scope and meaning. *Dolly, Inc. v. Spalding & Evenflo Companies, Inc.*, 16 F.3d 394, 397 (Fed.Cir.1994); *Becton,* 922 F.2d at 796. Second, the court must determine

if the accused device comes within the scope of the properly construed claims. *Dolly,* 16 F.3d at 397; *SmithKline Diagnostics v. Helena Laboratories Corp.*, 859 F.2d 878, 889 (Fed.Cir.1988).

■ The purpose of claim construction is to elaborate the normally terse claim language in order to explain and understand, but not change, the scope of the claim. *Scripps Clinic & Res. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed.Cir.1991). Unless evidence pertinent to the interpretation of a claim is in dispute, claim interpretation may be resolved by the court as a matter of law. *Markman v. Westview Inst., Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Markman v. Westview Inst., Inc.*, 52 F.3d 967 (Fed.Cir.1995); *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546 (Fed.Cir.1994); *Becton,* 922 F.2d at 796. "To determine the intended meaning of a claim, [courts] look to the claim language in context of the specification and the prosecution history." *Lantech,* 32 F.3d at 546.

Having examined and considered the claim language, the specification, and the context of the '046 invention, the Court is satisfied that Donovan has demonstrated a reasonable likelihood of success on the merits. Of the forty-four claims in the '046 Patent, the parties have focused primarily on the seven independent claims (claims 1, 15, 17, 25, 29, 36, and 41), five of which contain both of the disputed claim terms (claims 15, 17, 25, 36, and 41).[4] As the parties did during the hearing, the Court will discuss the two disputed elements as they appear in claims 1, 15, and 41. *See* Def's Exs. 122, 123, 126. The support column element first appears in

---

3. In its brief in opposition to Donovan's motion for injunctive relief, Aero initially argued about whether the "support panel" and "support columns" elements read on the Aer-Guard II or III. Aero's Oppos. to Donovan's Mot. for Prel. Inj. at 8. However, during the hearing Aero abandoned its infringement defense with respect to the support panel and focused exclusively on the support columns and the support flutes. Hrg. Tr. at 14.

4. This focus is appropriate because if the independent claims are not found to be infringed, the court cannot find dependent claims infringed. *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed.Cir.1989); *but see Wilson Sporting Goods v. David Geoffrey & Assoc.*, 904 F.2d 677, 685 (Fed.Cir.1990) (noting difference when infringement turns on equivalents).

claim 1, as follows: "two or more support columns extending from the lower edge portion, each of the support columns terminating in a closed column end ... whereby at least one of the closed column ends ... may have apertures cut therein." Def's Ex. 1, '046 Patent, Col. 16, *ll.* 19–21, 32–34. Aero argues that its AerGuard products do not infringe the support column element when it is properly construed in light of the specification. In the specification, the term support column is defined as "columns located beneath the effective inlet to the plenum chamber, *i.e.,* beneath the apertures ...." '046 Patent, Col. 9, *ll.* 52–55.

■ Essentially, Aero argues that "support column" should be construed to mean only a structure that is located beneath the apertures, and since the "pallet stops" on the AerGuards II and III are not below the apertures, they do not infringe the support column element. Hrg. Tr. at 267. What Aero has overlooked, however, is that the specification's definition continues, "and thus this term does not encompass the structure of the floating panel 12 located between adjacent support flutes." *Id. ll.* 55–57. When this fuller context is considered, the Court finds that the reference to the columns being beneath the effective inlet to the plenum chamber, or apertures, is meant to distinguish them from the support structures located within the floating panel. Moreover, the specification should be used to clarify unclear claim terms, not to "trump the clear meaning of a claim term." *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1187 (Fed. Cir.1998) (citing *E.I. du Pont de Nemours & Co. v. Phillips Petroleum,* 849 F.2d 1430, 1433 (Fed.Cir.1988)).

■ In claim 1 of the Onken Patent, the support columns are described as being capable of having apertures cut in the column ends. '046 Patent, Col. 16, *ll.* 32–34. In fact, the AirHead air return bulkhead pictured in the advertising produced by both AirFlo Products and Donovan, depicts a commercial embodiment with apertures cut in the column ends. *See* Def's

Exs. 16, 17. These embodiments also contain "crossover holes," located along the sides of the structures that appear to be support columns as claimed in the '046 Patent. *Id.* If Aero's definition of support columns were accepted—that they must be located below all apertures—it would be inconsistent with other claim language in claim 1, and with the descriptions given and the embodiments pictured in the specification. *See* Def's Ex. 1, '046 Patent, Col. 12, *ll.* 7–14; Col. 14, *ll.* 10–14, 40–46; Col. 16, *ll.* 32–34; Figs. 1, 2. In light of these potential inconsistencies, the Court cannot define the support column element as limited to being located beneath all of the apertures in the bulkhead.

Aero also suggests that the specification's definition of support column describes the function of those columns as preventing cargo from sliding beneath the lower support panel and blocking the air flow through the apertures. Aero's Brf. at 9. By emphasizing that the AerGuard II and III pallet stops do not extend to the floor and are instead located between panels of apertures, Aero argues that its pallet stops do not perform the claimed function of support columns. *Id.* at 10. Thus, Aero asserts that the AerGuard bulkheads do not contain the claimed support column structure. *Id.* Aero is mistaken. No language in claims 1, 15 or 41 limits the columns to that function, or requires them to extend below all apertures. The cited language merely states, "[i]n order to prevent cargo from sliding beneath the lower support panel ... the bulkhead *may* include one or more support columns descending from the lower support panel ...." Def's Ex. 1, '046 Patent, Col. 9, *ll.* 46–50 (emphasis added). Even if this description expressed a specific function of a support column, there is no indication that the column must be any specific length, or that it must not terminate short of the floor or at the same point as the apertures. Moreover, Henning testified during the hearing that the function of the pallet stops in the AerGuard II and III is to both stop pallets and prevent blockage of the

air intakes. Hrg. Tr. at 169. Thus, Aero's claim that the function performed by the '046 support columns is not performed by its own pallet stops is disproved by testimony of its own designer.

At most, the definition for support columns requires the columns to be located beneath the "effective inlet to the plenum chamber." The only evidence provided by any party regarding the location of the effective inlet to the plenum chamber is the testimony of Donovan's chief operating officer and a vice president of the company, Robert Wood ("Wood"). Def's Ex. 29, ¶ 1; Hrg. Tr. at 90. At the hearing Wood highlighted the support columns, the effective inlet and the plenum chamber of the '046 patented device, the AerGuard III, and of the figures in the '704 Patent, to assist the Court's understanding of these claim terms. See Def's Exs. 1A, 3A, 6A; Hrg. Tr. at 94–95, 97–98, 99–101, 111. He specifically described the effective inlet to the plenum chamber as "the actual area that borders the plenum chamber ... the bottom edge of the plenum ...." Hrg. Tr. at 99. The effective inlet is differentiated from the rest of the apertures as being the ultimate inlet to the chamber, while the other apertures feed air into the effective inlet. Id. at 99–100. In light of the evidence presented thus far, the Court is convinced that Donovan has demonstrated more than a reasonable likelihood of success on the issue of whether the support column element is found in the accused products.

Aero's primary defense against infringement of the other element in dispute, the support flute, parallels its arguments with respect to the support columns. Aero contends that the accused structure, the AerGuard "baffles," perform a different function and are structurally distinct from the claimed support flutes in the '046 Patent. Aero Brf. at 11. According to Aero, the main purpose of the AerGuard baffles is to direct air toward the refrigeration unit. Id. Further, unlike the support flutes in the AirHead, the AerGuard baffles contain sinusoidal recesses that allow for cross-ventilation within the plenum chamber.

Id. The baffles only incidentally function to reinforce the floating panel of the bulkhead. Id. at 12. It does not appear, however, that Aero's arguments are supported by the law or the evidence. First, instead of comparing its baffles to the claim language in the '046 Patent, Aero refers to and distinguishes structures found in the patent's commercial embodiments. This is not the proper task. See Dolly, Inc., 16 F.3d at 397 (infringement analysis requires court to interpret claim language and then determine whether accused device is within its scope). Second, Aero's president and its designer both testified that the AerGuard III was developed in 1998 because the AerGuard II was not strong enough. Hrg. Tr. at 145, 187.

Moreover, Henning stated that the "pockets" in the face of the floating panel of the models for the AerGuard II were designed to direct air flow and to strengthen the bulkhead. Hrg. Tr. at 168. Before he designs a product, Henning envisions himself as being that product and ascertains its primary purpose or function. Id. at 182. He testified that the primary purpose of an air return bulkhead "is to keep cargo from being up against the front of the trailer so that air can return from the floor up in that space." Id. Given this overriding purpose, it follows that the pockets, flutes, or baffles, located in the floating panel, must at least perform the function of preventing the panel from collapsing when cargo is loaded against it. As Henning admitted, that is one of the functions of the AerGuard baffles. Id. at 168. Other testimony also supports a finding that this function is performed by the AerGuard baffles. Hrg. Tr. at 126, Wood Cross–Exam.

The language in claim 15 regarding the support flute element merely describes structure that is "depressed inwardly from the front face of the floating panel," which includes "opposing flute ends, with flute walls extending between the flute ends." Def's Ex. 1, '046 Patent, Col. 17, ll 55–58. There is no requirement

that the flutes have any particular shape, spatial orientation, or internal configuration. Thus, Aero's claim that its baffles, which are undisputedly depressed inwardly from the front face of the floating panel, do not come within the scope of the claim does not appear at this stage of the litigation to present a reasonable challenge to Donovan's claim of infringement. The Court finds that Donovan has shown more than a reasonable likelihood of success on the merits of showing that the support flute claim element is contained in the accused device.

### 2. Validity

■■■■ Having found a reasonable likelihood of success on the merits of infringement of the two disputed claim elements, the Court now turns to an analysis of Aero's invalidity defense. A patent is presumed to be valid. 35 U.S.C. § 282. At the preliminary injunction stage, a challenger's evidence of invalidity must be "sufficiently persuasive that it is likely to overcome the presumption of patent validity." *PPG Indus., Inc.,* 75 F.3d at 1566. In other words, the challenger's evidence must raise a "substantial question" of invalidity. *Id.* Although the party seeking a preliminary injunction bears the burden of proving likelihood of success on the merits, meeting that burden is less strenuous on the issue of patent validity because the challenger retains the burden of production and persuasion on that issue. *See H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987) (at preliminary injunction stage burden of establishing invalidity remains on the challenger), *overruled on other grounds* by *Markman,* 52 F.3d at 977. "The evidence adduced in connection with a motion for preliminary relief must be considered in this light." *Id.*

Aero's evidence seems to raise two basic challenges to the validity of the '046 Patent. First, it addresses the issue of whether claim 1 was anticipated by a prior art reference in U.S. Patent No. 4,495,857 (the "Morgan" patent). An anticipation defense is based on the requirement that an invention must be novel or new to be patentable. "The novelty requirement lies at the heart of the patent system." I DONALD S. CHISUM, CHISUM ON PATENTS § 3.01 (Rel. No. 71, Sept. 1999) (hereafter "CHISUM ON PATENTS"). It is related, however, to the nonobviousness requirement, in that novelty is the first hurdle over which an inventor must proceed. If the invention is in fact new, that is, not anticipated by the prior art, "further inquiry must be made into whether it is new enough" to be patented. *Id.* Aero's second invalidity defense is directed at the latter issue, whether the claims of the '046 Patent were obvious in light of several prior art references, including the Morgan patent. The precise question is whether, in light of these references, the '046 invention would have been obvious to one with ordinary skill in the art. *Id.* The Court will address each of these challenges in turn.

■■■■ The standard for novelty is one of "strict identity." *Id.* This means that for a prior art reference to anticipate a claim, it "must disclose every element of the challenged claim and enable one skilled in the art to make the anticipating subject matter." *PPG Indus., Inc.,* 75 F.3d at 1566. A challenger cannot prove anticipation "by combining more than one reference to show the elements of the claimed invention." CHISUM ON PATENTS, § 3.02. Not only must a prior patent or publication contain all of the claimed elements of the patent claim being challenged, but they "must be arranged as in the patented device." *C.R. Bard, Inc.,* 157 F.3d at 1349.

■■■■ The prior art reference proffered by Aero in its anticipation defense is the Morgan patent, which is for a labyrinth ventilator for installation on the outside walls of cargo containers. Aero Ex. 8, Morgan Patent, Col. 1, *ll.* 5–11. The Morgan patent has one independent claim, in which the inventor claims

A labyrinth ventilator to be placed upon the sidewall of a container at the site of at least one air breather opening in the

sidewall, said ventilator being formed as a unitary structure comprising:

a housing having a front wall and a perimetric wall extending from a periphery of said front wall towards an open rear portion of said housing, there being a set of air inlet apertures disposed in said perimetric wall and extending transversely along a bottom of said housing;

a set of baffles including a lower baffle and an upper baffle extending transversely within said housing from one side of said housing to the opposite side of the said housing ... to provide a sinuous path to airflow ....

*Id.,* Cols. 5–6, *ll.* 54–65, 1–12.

Donovan has correctly pointed out that the Morgan patent does not claim any structure that would meet the support column element in the '046 Patent. In an effort to overcome this objection, Aero refers the Court to the "walls of the flute recesses 44" in the Morgan patent's specification, and asserts that they provide the support columns in this prior art reference. The Court is not convinced. In the detailed description of the patent, the inventor's reference to the flute recesses 44 describes them as being "disposed in the peripheral walls and extend[ed] to the flange 42 for enlarging portions thereof to facilitate securing of the ventilator 20 to the container wall 22." This description does not anticipate the support columns extending from the lower edge portion of a floating panel and terminating in a closed end. '046 Patent, Col. 16, *ll.* 18–20. In fact, the Morgan patent claims that the flute recesses are to be located at the junction of the perimetric wall with the flange, to provide access for fastening devices to fasten the ventilator to the container wall. Aero's Ex. 8, Morgan Patent, Col. 6, *ll.* 44–48. If anything, the flute recesses seem more analogous to the '046 Patent's support flute element, although the two are limited to different locations in the device. Donovan has shown more than a reasonable likelihood of success at defeating Aero's defense that the Morgan Patent anticipated claim 1 of the '046 Pat-

ent. As this is the only fully-articulated anticipation argument raised by Aero, the Court will turn to a consideration of the obviousness challenges.

■ Aero argues that the '046 invention was obvious in light of several prior art references. The factors considered when determining invalidity based on obviousness are 1) the scope and content of the prior art, 2) the level of ordinary skill in the field of the invention, 3) the differences between the claimed invention and the prior art, and 4) any objective evidence of nonobviousness, such as long-felt need, commercial success, the failure of others, or evidence of copying. *C.R. Bard, Inc.,* 157 F.3d at 1351. When a patented invention is a combination of known components that create a new result, "the prior art must provide a suggestion or motivation to make such a combination." *Heidelberger Druckmaschinen AG v. Hantscho Comm'l Prods., Inc.,* 21 F.3d 1068, 1072 (Fed.Cir. 1994); *Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 934 (Fed.Cir.), *cert. denied,* 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 250 (1990) (insufficient that prior art discloses components of patented device, either separately or in other combinations; "there must be some teaching, suggestion, or incentive to make the combination made by the inventor."). Thus, to meet its evidentiary burden on the issue of obviousness, Aero must have some evidence that the components claimed to be obvious both existed at the time of Onken's invention and combining them as Onken did was suggested or taught by the prior art.

■ In support of its arguments regarding obviousness, Aero lists elements from all forty-four claims that are allegedly obvious, and matches them with similar disclosures in a variety of prior art references. It then merely states that the disputed element would have been obvious in light of certain prior art references. At no point does Aero explain how the prior art references would teach, suggest or motivate the combination of elements invented

by Onken. Proof of obviousness requires more than just a summary of arguably unrelated prior art references that contain some of the elements found in the combination designed by the patentee. For this reason, the Court is inclined to find that Donovan has shown a reasonable likelihood of success at defeating the invalidity defense on the obviousness issue. Nevertheless, a brief review of the factors to be considered will further confirm this view.

The prior art references noted by Aero [5] in its obviousness defense include a patent for a ventilator for a freight container (Aero Ex. 8, Morgan Patent), a one-piece automotive trunk liner (Aero Ex. 2, Reynolds Re. 33,200), automobile carpet (Aero Ex. 3, Belk No. 2,909,234), a protective insert for the sides of load carrying vehicles (Aero Ex. 5, Carter No. 4,245,863), a molded liner for pickup trucks (Aero Ex. 6, Cantieri No. 4,279, 439; Aero Ex. 10, Queen No. 4,801,169), a window shade (Aero Ex. 9, Graves No. 4,539,239), a heat exchanger with flow passages (Aero Ex. 11, Atkin No. 5,033,537), a polystyrene foam masking member (Aero Ex. 12, Horiki No. 5,164,238), a vehicle luggage compartment (Aero Ex. 13, Ryan No. 5,167,-433), and a self-positioning tailgate cover (Aero Ex. 14, Arndt No. 5,372,397). None of these patents are for an air return bulkhead for a refrigerated truck trailer, nor were they for any other air return, or any bulkhead, or for any device or object related to a refrigeration unit.

The scope of prior art that is considered for purposes of an obviousness defense encompasses not only the field of the inventor's endeavor, but also any analogous arts. *In re GPAC Inc.*, 57 F.3d 1573, 1578; *see also Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 864 (Fed.Cir.1993). Determining whether prior art is analogous is a fact question. *Wang Labs., Inc.*, 993 F.2d at 864. It requires analysis of two criteria: "1) whether the art is from the same field of endeavor, regardless of the problem addressed, and 2) if the art is not within the same field of endeavor, whether it is still reasonably pertinent to the particular problem to be solved." *Id.* None of the prior art references cited by Aero in its obviousness defense is in the same field of endeavor as the '046 Patent. Therefore, the Court must look to see whether Aero presents any evidence that would demonstrate that the prior art is "reasonably pertinent" to the problem Onken set out to solve. Onken wanted to design an air return bulkhead that eliminated short-cycling while remaining efficient, was strong enough to resist damage from shifting cargo and forklifts, was easier and quicker to install, and that could be made to fit around any size refrigeration unit.

"A reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering the problem." *Wang Labs., Inc.*, 993 F.2d at 864. Aero has offered no evidence or explanation as to why the prior art references it cites would have commended themselves to Onken's attention as he considered the problems with existing bulkheads. In fact, Donovan presented evidence to the contrary. The two designers of the allegedly infringing product testified that they did not refer to vehicle trunk liners, window shades, or pickup truck bed liners when trying to design a new one-piece air return bulkhead for Aero. Hrg. Tr. at 170–71; Def's Ex. 130, Gothier Dep. at 63–64. At this stage of the proceedings, Aero has offered no evidence that would support a factual finding that any of the prior art references it

---

**5.** Although Aero listed other references in its brief, it acknowledged that those references were cited to the patent examiner and considered before the '046 Patent issued. For purposes of the obviousness analysis the Court has only used those references to determine whether they present evidence of any teaching of the combination invented by Onken. Aero also listed the '704 Patent, but cannot seriously suggest that it is a prior art reference with respect to the Onken Patent.

has cited, other than those that were cited to the patent examiner, were in the same field of endeavor or were reasonably pertinent to the problems Onken set out to solve. Thus the first factor of the obviousness inquiry—the scope and content of the prior art—is not supported by sufficient evidence to raise a substantial question of invalidity. *See PPG Indus., Inc.*, 75 F.3d at 1566.

The evidence presented at the hearing and by deposition shows that the ordinary skill in the field of this invention is at a relatively unsophisticated level. None of the designers of the '046 Patent or the AerGuard II or III received training beyond high school. Def's Ex. 130, Gothier Dep. at 6; Onken Decl. ¶ 3; Hrg. Tr. at 166, 269. Because the prior art references are not reasonably pertinent to the invention, the Court need not address the third factor, regarding the differences between the invention and the prior art. However, with respect to the fourth factor, Donovan has provided evidence that would suggest that copying of the commercial embodiment of the '046 Patent occurred, and that it was commercially successful. In fact, Donovan admits that its MaxAir bulkhead copied the AirHead bulkhead. All of these factors weigh against finding the '046 Patent obvious. When combined with the absence of analogous prior art, these objective factors help convince the Court that Donovan has more than a reasonable likelihood of succeeding in opposing the obviousness defense presented by Aero.

## C. Irreparable Harm Absent Injunction

■ Aero argues Donovan has not made a strong showing of likelihood of success on the merits, so it is entitled to no presumption of irreparable harm. Such a presumption arises when a patentee makes a clear showing that its patent is valid and being infringed. *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed.Cir.1995). The Court cannot agree with Aero's assessment of Donovan's evidentiary showing, for it demonstrates more than a reason-

able likelihood of success on the merits. Consequently, Donovan deserves the procedural benefit of a presumption of irreparable harm. This means that Aero has the burden of producing evidence sufficient to establish that Donovan would not be irreparably harmed if the injunction is erroneously denied. *Polymer Tech., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed.Cir.1996).

Aero claims it has met this burden with evidence that Donovan delayed in seeking a preliminary injunction and Donovan was willing to license the patent to Aero in exchange for a royalty fee. *See T.J. Smith & Nephew Ltd. v. Consolidated Med. Equip., Inc.*, 821 F.2d 646, 648 (Fed.Cir. 1987) (noting that presumption of irreparable harm could be rebutted by evidence of delay in seeking injunction and by fact that patentee had licensed its patent to two licensees). Aero also points to the fact that Donovan did not immediately file suit for infringement after the '046 Patent issued in September of 1998, and that once the licensing discussion ended, Donovan still did not file suit. Finally, Aero contends that even after suit was filed Donovan waited another three months to move for injunctive relief.

■ In support of these arguments, Aero cites cases that are distinguishable from the facts present in this action. For example, in support of its claim that Donovan delayed seeking injunctive relief and should therefore be denied same, Aero relies on a case in which the patentee had delayed seeking an injunction for fifteen months, and there was no showing of likelihood of success on the merits. *See T.J. Smith & Nephew Ltd.*, 821 F.2d at 647–48; *see also High Tech Med. Inst.*, 49 F.3d at 1557 (seventeen months is a substantial period of delay that diminishes the sense of urgency required for issuing preliminary relief); *Polymer Tech., Inc.*, 103 F.3d at 975. In comparison, Donovan's delay was minimal, only three months after suit was filed, and less than six months after Donovan obtained the patent.

The patentee in *Nephew* had also licensed the patent to two licensees for a long period of time, further diminishing a finding of irreparable harm. Donovan has not licensed the patent to anyone, and there is no evidence regarding the conditions or terms under which such a license would be granted. Thus, the fact that Donovan entered discussions with Aero about possible licensing of the '046 Patent alone will not suffice to rebut the presumption of irreparable harm.

In addition, Donovan presented evidence comporting with eight of the nine factors identified in *Hybritech* as supporting a finding of irreparable harm. Specifically, there was evidence of a substantial amount of competition in the air return bulkhead field, and the alleged infringer has a large presence in that field. By Aero's president's own testimony, the technology in this field changes rapidly, and research and development are ongoing tasks of the major competitors. In addition, the '046 Patent enabled its inventor's company to establish a market position and create new business relationships, and there is no evidence that Donovan did not similarly benefit from this patent.

There is also evidence that by the time this litigation concludes, the value of the patent may be diminished as new technology bypasses it, such as the AerGuard IV. Testimony from both Aero's president and Donovan's general manager indicates that the potential injury if the injunction were erroneously granted or denied would be unpredictable. Finally, the evidence supports a finding that others would be encouraged to infringe or continue infringing if the injunction were erroneously denied. When added to the lack of evidence to rebut the presumption of irreparable harm, and the relative strength of the evidence on the merits, these factors tip the balance in favor of granting injunctive relief.

### D.   Balance of Hardships

In this matter, the hardships on Aero if the injunction issues will be diminished by the fact that it will soon introduce a new product, the AerGuard IV, to replace the alleged infringing product. No evidence was presented that the AerGuard IV will infringe the patent, which means that Aero will soon have a viable alternative product with which to compete in the market. Aero argues that the balance tips in its favor because all four major manufacturers in this market have been competing for years, suggesting that the status quo would be to allow such competition to continue. The problem is that the status quo changed when Donovan acquired the '046 Patent and asserted its right to enforce it against its competitors. The status quo then becomes preventing further trespass on the patent. In light of these circumstances, and the more than reasonable likelihood of Donovan's success on the merits, the Court finds that the balance of hardships tips in favor of granting a preliminary injunction.

### E.   Public Interest

There is no evidence that the public interest will be affected by a preliminary injunction against Aero, but the public's interest in the protection of patents would be harmed if the Court erroneously denied the injunction. Aero presented evidence that other one-piece bulkheads were available to the public in the market. This fact eliminates the concern about whether the public could get a comparable product from other sources. The Court has found that Donovan has more than a reasonable likelihood of success on the merits, which means the public interest lies in protecting the patent. In light of the evidence favoring the grant of an injunction with respect to the other factors, the Court is convinced that this factor is at most of neutral effect.

### III.   CONCLUSION

The Court has thoroughly reviewed the evidence presented by the parties in support of their positions at the hearing held in this matter on October 19 and 20, 1999, and that was attached to their briefs. After careful consideration of this evidence

and the parties' arguments, the Court finds that Donovan's motion for a preliminary injunction should be **GRANTED.** Aero is preliminarily enjoined from making, using, selling or offering to sell its AerGuard II and AerGuard III bulkheads, and colorable imitations thereof, until after the full trial on the merits of this infringement action. Donovan shall post a bond with the Court to secure this injunction in the amount of $250,000.00.